**SALOMON BROTHERS, INC., Plaintiff,**

v.

**William J. CAREY, Defendant.**

**No. 82 Civ. 0264 (CBM).**

United States District Court,
S.D. New York.

Jan. 24, 1983.

Wachtell, Lipton, Rosen & Katz by Paul K. Rowe, New York City, for plaintiff.

Cohen, Brame & Smith by Jeffrey L. Smith, Susan J. Trout, Denver, Colo., for defendant.

MEMORANDUM OPINION AND ORDER

MOTLEY, Chief Judge.

Plaintiff Salomon Brothers, Inc. (Salomon Brothers) brought this action for a declaratory judgment pursuant to 28 U.S.C. § 2201 (1976) and Rule 57 of The Federal Rules of Civil Procedure. Defendant Wil-

liam J. Carey (Carey), a citizen of Dallas, Texas, has moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted within the meaning of the Declaratory Judgment Act. Jurisdiction of this action is conferred by 28 U.S.C. § 1332 (1976). For the reasons set forth below, defendant's motion to dismiss is denied.

*Facts*

Salomon Brothers is a Delaware corporation with its principal place of business in New York City. Salomon Brothers is engaged in the business of, among other things, buying, selling, and trading securities and commodities. On October 7, 1980, after several days of negotiations in New York, Carey and Salomon Brothers entered into a written agreement pursuant to which Salomon Brothers agreed to act as Carey's broker in the purchase and sale of securities. On December 28, 1981, Carey's attorneys, a Denver law firm, sent a letter (attached herein as Appendix A) to Salomon Brothers in New York in which they stated that Carey had certain legally cognizable claims against Salomon Brothers with respect to the handling of Carey's account. These claims arise from Salomon Brothers' alleged breach of the customer agreement and of certain general fiduciary duties owed by Salomon Brothers to Carey. Specifically, Carey's attorneys claimed that Salomon Brothers 1) failed to follow certain procedures agreed upon with Carey at the outset of his investing; 2) failed to exercise reasonable care in carrying out certain directions given to Salomon Brothers by Carey with respect to his account; and 3) breached fiduciary obligations owed to Carey in the handling of his account. Carey claims that as a result of Salomon Brothers' mismanagement of his account, he suffered a loss of $1,500,000.

In the letter to Salomon Brothers, Carey's attorneys stated that while Carey had the basis of a lawsuit, the purpose of that letter was to initiate settlement negotiations and avoid litigation. Upon receipt of this letter, however, Salomon Brothers consulted with its New York attorneys and then filed the instant lawsuit for a judgment declaring that Salomon Brothers is not liable to Carey.

*Issues*

At the outset, it is important to distinguish two separate issues before the court. First, there is the question of subject matter jurisdiction, *i.e.* whether the complaint alleges a case or controversy within the meaning of Article III of the Constitution since the Declaratory Judgment Act applies only in "a case of actual controversy." 28 U.S.C. § 2201 (emphasis added); *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1936) ("The word 'actual' is one of emphasis rather than of definition"); *see also Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272–74, 61 S.Ct. 510, 511–12, 85 L.Ed. 826 (1941). It is clear that unless plaintiff's allegations allege an actual controversy, the court is without power to grant declaratory relief and must dismiss for lack of subject matter jurisdiction. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. at 272, 61 S.Ct. at 511. Second, assuming that an actual controversy exists, there is the question of whether the court should, in the exercise of its sound discretion, assume subject matter jurisdiction and entertain the declaratory judgment action. *Public Affairs Associates v. Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962) ("The Declaratory Judgment Act was an authorization not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so"); *Eccles v. Peoples Bank,* 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948); *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1941); *see also Beacon Const. Co. v. Matco Electric Co.,* 521 F.2d 392, 397 (2d Cir.1975); *Dr. Beck & Co. G.M.B.H. v. General Electric Co.,* 317 F.2d 538, 539 (2d Cir.1963).

*Discussion*

The court notes that the parties have confused these two questions. For instance, Carey's motion to dismiss raises the jurisdictional issue, but Carey cites cases in

support of the court's discretionary power to dismiss. *See* Defendant's Brief at 2–4, 5; Defendant's Reply Brief at 1, 3–4. While Salomon Brothers claims that the court should not, in the exercise of its discretion, dismiss its complaint, *see* Plaintiff's Opposition Brief at 1, it cites cases in which courts found subject matter jurisdiction in business tort cases involving similar circumstances as the instant case. *Id.* at 8–9.

This court believes that a proper analysis of this case requires an examination of both these questions. Since the court believes that the applicable equitable doctrines governing its discretion require the court to entertain the case if the court has subject matter jurisdiction, the court turns now to the issue of whether an actual controversy exists.

In determining whether an actual controversy exists, this court is guided by the principles enunciated by Justice Murphy:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. *Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment* . . . . It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (emphasis added); *see also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). Whether a particular case is sufficiently real and immediate is a matter of degree and is to be determined on a case by case basis. *Muller v. Olin Mathieson Chemical Corporation,* 404 F.2d 501, 504 (2d Cir.

1968). In examining the individual case, the court is guided by certain general principles. As Professors Wright and Miller have stated:

> There is little difficulty in finding an actual controversy if all the acts that are alleged to create liability already have occurred. The court is then merely asked, as in any litigation, to determine the legal consequences of past events and it is immaterial that it may be the one allegedly liable, rather than the person to whom he would be liable, who asks for the judicial determination. The problem is when a declaration is sought on the legal consequences of some act that may or may not occur.

10 C. Wright and A. Miller, Federal Practice and Procedure, § 2757 (1973) (footnote omitted). *See also Armour and Company v. Ball,* 468 F.2d 76, 79 (6th Cir.1972) (where acts violating statute and prosecutions for violations had already occurred, a "live controversy" existed), *cert. denied,* 411 U.S. 981, 93 S.Ct. 2267, 36 L.Ed.2d 957 (1973).

■ In this case, all of the acts in question occurred between October 7, 1980 and December 28, 1981 (Complaint ¶¶ 7, 9). Carey has fixed his damages at $1.5 million (*id.* at 9). There is no issue of future contingent events which might result in liability  This court believes that there is a substantial controversy between the parties with respect to the performance of Salomon Brothers under its customer agreement with Carey. In addition, an actual controversy exists between the parties with respect to the fiduciary duties owed by Salomon Brothers to Carey. The parties here have sharply adverse legal interests since Carey asserts legally cognizable claims sounding in contract and agency law and Salomon Brothers asserts a number of defenses denying liability for any damages. Thus, this court concludes that an actual controversy exists and that it has jurisdiction under the Declaratory Judgment Act.

■ Turning now to the issue of the court's discretion, the court notes that this question of judicial discretion is governed by equitable principles. As the defendant

correctly argues, one of the factors to be considered by the court is whether the party seeking declaratory relief is anticipating. suit in an inconvenient forum and seeks to secure a more favorable forum by filing an action for a declaratory judgment. *See, e.g., Hanes Corporation v. Millard,* 531 F.2d 585, 592–93 (*D.C.Cir.1976*) ("The anticipation of defenses is ordinarily not a proper use of the declaratory judgment act. It deprives the plaintiff of his traditional choice of forum and timing, and it provokes a disorderly race to the courthouse"); *Cunningham Brothers, Inc. v. Bail,* 407 F.2d 1165 (7th Cir.), *cert. denied,* 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969). This court, however, is constrained to follow the equitable doctrines as set forth by the Second Circuit in *Broadview Chemical Corporation v. Loctite Corporation,* 417 F.2d 998 (2d Cir.), *cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1969). In *Broadview Chemical,* the Second Circuit first noted that "in reviewing the trial court's exercise of discretion to grant or refuse declaratory relief, a sound position is that the appellate court may substitute its judgment for that of the lower court. The determination of the trial court may, therefore, be reversed where, though not arbitrary or capricious, it was nevertheless erroneous." *Id.* at 1000 *quoting* 6A Moore's Federal Practice, 3030 (2d ed. 1966). The court then stated:

> Applying the test enunciated above, we hold that the district court committed error. "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to proceeding." ... It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained and the failure to do so is error.

417 F.2d 1001 *quoting* Borchard, *Declaratory Judgments* 299 (2d ed. 1941); *see also Maryland Casualty Company v. Rosen,* 445 F.2d 1012, 1014 (2d Cir.1971) (citing the two criteria); *New York Guardian Mortgagee Corp. v. Cleland,* 473 F.Supp. 409, 418 (S.D. N.Y.1979) (Lasker, J.) (citing *Broadview Chemical* for the admonition that if either criteria is present, action should be entertained).

■ In this case, at least one if not both of these criteria will be satisfied by a declaratory judgment. This court's judgment will serve a useful purpose in alerting other Salomon Brothers customers, who have entered into similar agreements, of the legal consequences of Salomon Brothers' actions under both contract and agency law (*see* Appendix at 5). This judgment will both clarify and settle the legal relations in issue as well as finally terminate the uncertainty and controversy giving rise to the proceeding. Carey has made no indication that he cannot resolve all the issues involved herein, including the issue of damages, by asserting a counterclaim. *See Washington Scientific Industries, Inc. v. American Safeguard Corporation,* 308 F.Supp. 736, 740 (D.Minn. 1970) (in action against corporation and president for declaration of rights under contract, defendants' motion to dismiss was denied and court noted that Fed.R.Civ. P. 57 retains to parties right to jury trial which certainly encompasses a defendant's counterclaim).

As the court has already noted, significant equities do weigh in Carey's favor. Carey's attorneys sent Salomon Brothers a letter in New York City in a good faith effort to settle the controversy without litigation. Salomon Brothers responded by immediately racing to the courthouse. While this unseemly "race for res judicata," *see,* C. Wright and A. Miller, *supra,* § 2759, is an equitable factor worthy of consideration, the law of this Circuit gives greater consideration to two other criteria, both of which are satisfied in this case.

Accordingly, the motion to dismiss is denied. The next pretrial conference will be held on February 4, 1982 at 2:00 p.m. in Room 906.

So Ordered.

## APPENDIX A

ROGER C. COHEN
JEFFREY L. SMITH
FRANK A. BRAME III
SHARON L. HAWKE
PERRY S. NISSLER
JOHN P. CONGDON
CHARLES C. BONNIWELL
JAMES V. DALTON
LEE W. ZIEROTH
LANCE P. VANZANT

### COHEN BRAME & SMITH

PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

1518 LINCOLN CENTER BUILDING

1660 LINCOLN STREET ,

DENVER, COLORADO 80264

303–837–8800

December 28, 1981

Salomon Brothers
One New York Plaza
New York, NY 10004

Attention: Mr. Richard G. Rosenthal

Re: *William J. Carey*

Gentlemen:

This firm has been consulted by William J. Carey of Dallas, Texas, with respect to the legal aspects of the losses he realized during 1981 through trading in United States Treasury securities with Salomon Brothers. He has furnished to us all of the facts and materials that he has on these transactions and we have analyzed that information, researched and considered its legal aspects and discussed certain of its elements with outside experts. The purpose of this letter is to discuss Mr. Carey's claim and its possible settlement without litigation.

### Facts

We understand the basic facts to be as follows:

In November, 1980 Mr. Carey contacted Michael Steiber of Salomon, whom he had previously known, about a tax-shelter program involving government securities which he was considering undertaking with another firm. Mr. Steiber advised him that Salomon offered such a management service to a small number of individual clients with similar tax-shelter requirements and proposed that they do so for him. After lengthy discussion, Mr. Steiber introduced Mr. Carey to Marion Schaeffer who would handle his account.

The tax-shelter strategy involved the purchase of United States Treasury obligations on a highly leveraged basis with a simultaneous sale of offsetting securities to protect against any drop in value of the government obligations. At the outset Mr. Carey explained to Mr. Steiber and Ms. Schaeffer that he was completely unsophisticated about such activity but Mr. Steiber assured him that they would provide him with sufficient information and recommendations to allow him to proceed prudently. While Salomon clearly stated that they would not handle Mr. Carey's account on a discretionary basis, it was agreed that they would:

1. Furnish him with daily market information and research opinions;

2. Define the options open to him on a current basis; and

3. Provide him with their best recommendations for specific action.

Mr. Carey made clear from the outset that without this procedure and practice by Salomon, he could not and would not proceed with the activity. Moreover, it was agreed that once a decision had been made by Mr. Carey based upon the foregoing, Salomon would utilize its own professional judgment as to the precise timing and manner for carrying out that decision. For example, $15,000,000 of government securities maturing in 1982 were purchased by

Salomon without a direct order·from Mr. Carey and in all instances the offsetting hedges were selected and purchased by Salomon in its discretion.

The Carey program strategy, recommended by Salomon, was based upon the belief, shared by Ms. Schaeffer and Messrs. Steiber and Carey, that interest·rates would decline and the declining rates would reduce the negative differential between the interest he earned and the margin interest expense he incurred. Ultimately Mr. Carey's investments involved the ownership of approximately $55,000,000 of government obligations. Interest rates however remained high with the result that his negative financing costs by February of this year accumulated to more than $500,000.

In February interest rates did in fact begin to decline at which time Mr. Carey and Ms. Schaeffer considered removing his hedge so that he would have the opportunity to offset his previous losses with appreciation on his government securities. This discussion culminated in a recommendation and decision to lift the hedge but with the clear and explicit understanding by and direction to Ms. Schaeffer that the hedge was to be reinstated as soon as interest rates showed any signs of turning back up. Ms. Schaeffer implemented the hedge lifting decision on February 23, 1981 when Mr. Carey was in Mexico.

Mr. Carey's position remained unhedged throughout March and on April 2 he met with Ms. Schaeffer and Drew Melton of Salomon, at which time his unhedged position was again reviewed. Influenced by Mr. Melton who believed that rates might decline 150 basis points more, the conclusion of the meeting was to remain unhedged with a reiteration by Mr. Carey, and agreement by Ms. Schaeffer, that the hedge should be immediately reinstated at the earliest point the market appeared to turn and the cost of money increase.

During April interest rates however went up substantially and by the end of April Mr. Carey's position had deteriorated an additional $700,000. Throughout this period while the possibility of reestablishing the hedge was always present and on occasion discussed, Salomon did not recommend that this action be taken. Moreover, Salomon did not even inform Mr. Carey of the extent of the foregoing deterioration to his position.

Ms. Schaeffer went on vacation April 24 and advised Mr. Carey that Mr. Melton would service his account. During the last week of April, Mr. Carey himself became concerned about the money market in view of all of the adverse news given notoriety in the financial press. Not having heard from Salomon since April 24, on April 30 Mr. Carey telephoned Mr. Melton and expressed deep concern about his position. Mr. Melton called Mr. Carey back several hours later and confirmed the seriousness of the situation, but could not recommend any constructive action to take at that time. The following Monday when the market had deteriorated further, Mr. Carey telephoned Mr. Steiber who was appalled by his situation and how it could have occurred. Mr. Steiber acknowledged that Mr. Carey would certainly not have entered into the tax-shelter program with Salomon in the first instance without its assurances that it would make and carry out recommendations on a continuing basis upon which Mr. Carey could rely.

From the end of April forward Mr. Melton handled Mr. Carey's account and endeavored to cut his losses. Ultimately, Mr. Carey's positions were closed out with a total loss to him of approximately $1,500,-000.

### Discussion

Based upon the foregoing facts together with the other information we have reviewed, it is our opinion that Mr. Carey has a valid claim for damages against Salomon (and possibly also its parent, Phibro Corp.). These damages should include his actual losses from the transactions plus exemplary or punitive damages. Suit with respect to the claim may be brought in Texas or New York.

Mr. Carey's claim rests on multiple grounds. First, it is clear that Salomon failed to follow the procedures agreed upon with Mr. Carey at the outset of his investing. That is, during the more than two-month period between the date his hedge was lifted and the end of April when he himself expressed alarm, Salomon made no recommendations, other than on April 2 to remain unhedged, and allowed Mr. Carey's account to slide into a deficit of more than double the amount of its loss at the outset. In fact, during the critical week between Ms. Schaeffer's departure and Mr. Carey's April 30 call, there was no contact of any nature.

Second, Salomon failed to use reasonable care in carrying out the directions given to it by Mr. Carey in February—to reestablish the hedge when interest rates first appeared to be turning upward. Granted it is difficult to recognize precisely the bottom of any market, it was clearly careless to do nothing during a more than 225 basis point change in the market—a change which occurred during the month of April. The likelihood of such a change should have been apparent at an early point to professionals such as Salomon in view of the announced borrowing activities of the Treasury and the continuing declared policy of the Federal Reserve to keep rates high and limit the growth of the money supply, to say nothing of the predictions of Salomon's own economist, Henry Kaufman. (A review of *Wall Street Journal* reports for this period is illuminating and adds to the difficulty of comprehending how Salomon and Ms. Schaeffer allowed Mr. Carey's position to remain unhedged.) In this respect, it must be borne in mind that Mr. Carey's objective was never to speculate in government securities but rather to shelter income from taxes in a risk covered manner.

And third, the entire arrangement between Salomon and Mr. Carey was itself imprudent and contrary to Salomon's fiduciary and general legal obligations to a client. Mr. Carey advised Salomon at the beginning of their relationship that his goal was tax-shelter and not speculation and that he was inexperienced with the type of activity to be undertaken. Both he and Mr. Steiber acknowledge that he agreed to proceed only with the assurances that Salomon's explanations and recommendations would allow him to achieve his objectives irrespective of his inexperience. Quite logically, Mr. Carey requested Salomon to handle his account on a discretionary basis. Salomon nonetheless declined yet at the same time agreed to carry out decisions at its own discretion without specific orders from Mr. Carey (e.g. Salomon always selected the hedge position). At no time during the critical periods did Salomon ever provide Mr. Carey with meaningful reports on his overall position—contrary to the standards of retail brokerage transactions. Only in May upon Mr. Steiber's insistence did Salomon institute a useful reporting procedure. And most significantly, Salomon not only allowed and acceded in Mr. Carey's long position being unhedged but in fact recommended it. Two percent margin requirements for government securities permitted Mr. Carey to utilize tremendous leverage and without any doubt the credit markets were volatile throughout. This combination of circumstances exposed Mr. Carey's limited net worth to an incredible level of risk that Salomon must have known to be totally imprudent, irrespective of the outcome. It was only Mr. Carey's own recognition of this situation at the end of April that finally brought matters into a sensible prospective. In short, Salomon simply mishandled its investing relationship with Mr. Carey in every respect from start to conclusion at a cost to him of $1,500,000 along with severe mental anguish and distress.

We have recommended that Mr. Carey vigorously pursue his claim against Salomon. He is somewhat reluctant to do so because of the publicity to both himself and Salomon, the cost and inconvenience of litigation and because of concern over the effect public discussion might have on Internal Revenue Service review of the income tax strategy followed here by him and other Salomon customers. Certainly, we share his preference for settlement, if possible on

a reasonable basis. I understand a small settlement payment ($100,000) has been offered by Daniel Sargent on behalf of Salomon which appears totally disproportionate to the liability and loss. We would however recommend a settlement involving reimbursement of Mr. Carey's actual losses without consideration of other damage elements which would be recoverable by him in litigation.

Please let me hear from you or your counsel not later than January 14, 1982.

Very truly yours,
COHEN BRAME & SMITH
Professional Corporation
By  /s/ Roger C. Cohen

RCC/lm

cc:  William J. Carey
Daniel I. Sargent