OPINION OF THE COURT
Harold Baer, Jr., J.
Plaintiffs, five prominent dealers in United States Government securities, brought this action seeking a declaratory judgment of nonliability to defendants on any cause of action within this court’s jurisdiction. Defendants now move to dismiss the action for failure to state a claim and on the basis of forum non conveniens. Since this matter was begun, two plaintiffs have settled, leaving Salomon Brothers, Inc., Morgan Stanley & Co., Inc. and Goldman, Sachs & Co. to carry on the fight. A related action is pending in the United States District Court for the Southern District of West Virginia.
The events that have given rise to this action can be succinctly stated. The West Virginia State Board of Investments (Investment Board) directed the investment of State and local government funds through the Consolidated Fund. The Investment Board engaged in numerous transactions in United States Government securities through plaintiff dealers. Vast sums of money were involved. The staff of the State Treasurer’s office was designated by the Investment Board to serve as money managers for the Consolidated Fund. It appears that the Investment Board and its managers succeeded for a time in reaping large financial rewards for the Fund through their investments in United States Government securities. At a certain point, however, things went sour in dramatic fashion: it is claimed that over $100 million were lost, with the severity of the losses having been increased by a cover-up engaged in by State officials. A scandal erupted, which produced a bill of impeachment against the State Treasurer, his resignation just prior to his trial and a cleaning house among the money managers in the Treasurer’s office.
The upheaval also generated angry glances directed at plaintiffs and other dealers by State officials. The State began to consider instituting suit against plaintiffs and let the plaintiffs know that. The dealers, perhaps foreseeing and certainly worried about what the future held in store for them in West Virginia, decided upon a preemptive strike. They instituted this action for a declaratory judgment of nonliability before *291 West Virginia was able to act.[1] The State’s anger at the dealers was transformed three days later into two actions in State court against the dealers. The State therein claims that the dealers misled the money managers, described as unsophisticated and inexperienced, into making highly speculative and unsound investments in violation of State investment policy. The State asserts securities law violations, breach of fiduciary duty, fraud and other wrongs. Later, the dealers brought another declaratory judgment action in the United States District Court for the Southern District of New York. At that point, the investment disaster in West Virginia had spawned four separate actions in two States. Subsequently, the West Virginia State actions were removed to Federal court in that State. In March 1990, the New York Federal action was transferred to West Virginia. In the wake of this most recent development, the dealers contend even more urgently than before that this court should constitute the sole battleground for this controversy.
This court has discretion whether or not to assume jurisdiction over an action for a declaratory judgment. (CPLR 3001; James v Alderton Dock Yards, 256 NY 298, 305 [1931].) I am called upon here to exercise my discretion in a context that is, so far as the research of the parties here disclosed, without precise precedent in this State.
In the long history of Anglo-American law, the declaratory judgment action is, comparatively speaking, new-born. The action was introduced in preliminary form only late in the 19th century and in New York in the Civil Practice Act in 1921. (3 Weinstein-Korn-Miller, NY Civ Prac jj 3001.01 [1989].) The Federal Declaratory Judgment Act (now 28 USC § 2201) was enacted in 1934. (6A Moore, Federal Practice [f 57.01 [2]; If 57.03 [2d ed 1989].) This form of action was felt to be necessary to provide a remedy in situations in which the traditional forms of action had proven to be inadequate, a fact which it is important to keep in mind.
The principal purpose of the declaratory judgment is to *292 provide a means by which the parties to a legal relationship may obtain a resolution of uncertainties about current, continuing or prospective obligations between them. "The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jurai relation either as to present or prospective obligations.” (James v Alderton Dock Yards, supra, 256 NY, at 305.) Referring to the Federal act, one court said that "[i]t was the congressional intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued.” (Edelmann & Co. v Triple-A Specialty Co., 88 F2d 852, 854 [7th Cir], cert denied 300 US 680 [1937].) Other aims of the declaratory judgment likewise reflect this "potential, prophylactic character” of the remedy (6A Moore, op. cit., at 57-22; see, Borchard, Declaratory Judgments, at 280-289 [2d ed 1941]).
The situation with which I am presented, however, is quite different from the archetype. The dealers are not involved in a current relationship with the Investment Board or the State nor is there the prospect of one. There is no dispute between the parties over their respective duties now or in the future. Prior to the institution of this suit there were no damages accruing to plaintiffs because of action by the defendants. No claim asserted by defendants impaired any property right of plaintiffs. There was and is no group of persons or entities situated similarly to the dealers whose relationships with defendants might be clarified by a judgment in this case. This case simply involves on a grander scale what the average tort case does — a claim by a party injured in the past for damages for that injury. The liability, if any, is for. past acts. (Cf., Automated Ticket Sys. v Quinn, 90 AD2d 738 [1st Dept 1982], affd 58 NY2d 949 [1983].) This is not, in my judgment, the kind of situation for which the declaratory judgment was developed.
The dealers had a traditional remedy — to prepare and present their defenses in the anticipated suit by defendants. Given its origin and purpose, a declaratory judgment will usually not be granted when a full and adequate remedy can be afforded in a traditional form of action. (Lawler v Clinton St. Dev. Props., 63 AD2d 827 [4th Dept], lv denied 45 NY2d 710 [1978].) Although plaintiffs got to the courthouse a few days before defendants, the fact is that there is now pending in West Virginia a normal damages action in which the dealers may *293 present, and apparently have presented, all the defenses and counterclaims they have. That is the appropriate forum for the resolution of this controversy. (See, Ithaca Textiles v Waverly Lingerie Sales Co., 24 AD2d 133 [3d Dept 1965], affd 18 NY2d 885 [1966]; Reynolds Metals Co. v Speciner, 6 AD2d 863 [1st Dept 1958].)
In arguing otherwise, the dealers rely upon several cases that do not, as I read them, support the conclusion they urge upon me. In Kalman v Shubert (270 NY 375 [1936]), the plaintiff, author, composer and owner of a group of operettas, sought a declaration about the relative rights in the works as between himself and the defendant, who claimed exclusive performance rights based upon a written instrument. The court noted that no other form of relief was available to the plaintiff. The plaintiff, there, though, needed to take some kind of action because the claim by the defendant was causing him continuing damage. The defendant’s claim was a cloud upon the titles of the operettas that barred plaintiff from selling rights in the works, while the value of the operettas perhaps diminished with the passage of time and the consequent changes in public tastes. In contrast with the case before me, "we have here a case where the plaintiff must have affirmative relief to quiet a disputed jurai relation as to both present and prospective obligations, and existing forms of action, aside from that of declaratory judgment, are not reasonably adequate.” (270 NY, at 378.) New York Foreign Trade Zone Operators v State Liq. Auth. (285 NY 272 [1941]) presented a comparable situation. At issue there were only narrow questions of law relating to whether an operator of a certain kind of business required a license. There was a continuing jurai relation over which there was more than a continuing cloud — the plaintiff, if unable to obtain a judicial statement defining the rights and obligations of that relationship, risked criminal prosecution.[2]
Closer to the mark, yet distinguishable too, is Salomon Bros, v Carey (556 F Supp 499 [SD NY 1983]). There, a client of one of the plaintiffs in this case, Salomon Brothers, advised it that *294 he believed he had claims for breaches of contract and fiduciary duty arising out of Salomon’s handling of his account. Salomon, ever energetic, promptly filed a declaratory judgment action. Judge Motley allowed the action to proceed, though not without evident misgivings. That case, however, involved an interpretation of a customer agreement and the court relied upon the general benefit that it believed would flow from an adjudication of the declaratory judgment action —the clarification of Salomon’s duties for customers who had entered into similar agreements. No such benefit is involved here.[3]
Not involved in a disputed jurai relation, not suffering or likely to suffer damage because of uncertainty over the nature and scope of a legal duty and not standing in for others who might benefit from a declaration here, the dealers in resorting to this remedy in this court can only be seen to be forum-shopping. This is not a legitimate purpose for the invocation of the declaratory judgment remedy. "The courts properly decline relief if the declaratory judgment procedure * * * is being used for 'procedural fencing’ or 'in a race for res judicata’ ”. (10A Wright-Miller-Kane, Federal Practice and Procedure § 2759, at 651 [1983].) One of the architects of declaratory judgment jurisprudence writes that "where a party’s action is about to begin or has begun, it serves no sensible end to permit his adversary to appear as equitable actor and start the proceedings for an autonomous declaration that he has a good defense to his opponent’s pending or imminent action.” (Borchard, op. cit., at 303.)
In Hanes Corp. v Millard (531 F2d 585, 592-593 [DC Cir 1976]), the court said that "[t]he anticipation of defenses is not ordinarily a proper use of the declaratory judgment procedure. It deprives the plaintiff of his traditional choice of forum and timing, and it provokes a disorderly race to the courthouse.” The latter phrase at least seems crafted to the case at bar. To sustain the claim before me would authorize prospective defendants in tort actions to engage in what even Judge Motley *295 in the Salomon Bros. case recognized to be an "unseemly” race to the courthouse (556 F Supp, supra, at 502) in an effort to gain tactical advantage over persons in this State or other States who are contemplating suit.[4] This would stand traditional legal procedures on their head. (See, Cunningham Bros. v Bail, 407 F2d 1165 [7th Cir], cert denied 395 US 959 [1969]; Hutton & Co. v Cook, 292 F Supp 409 [SD Tex 1968].) The alleged wrongdoers in this saga present themselves before this court in the guise of plaintiffs inviting the alleged victims to assert the claims that are the heart of the legal controversy in the form of counterclaims. Apart from the tactical advantage, there is no need for such an inversion of customary procedural roles. (See, Amerada Petroleum Corp. v Marshall, 381 F2d 661 [5th Cir], cert denied 389 US 1039 [1967]; Channel Master Corp. v JFD Elecs. Corp., 263 F Supp 7 [ED NY 1967]; Note, Availability of a Declaratory Judgment When Another Suit is Pending, 51 Yale LJ 511, 515 [1942].)
Plaintiffs argue that there was a need for the institution of this action because of the uncertainty created by defendants’ investigations and the cloud over the dealers’ businesses and the market in Government securities. Although no doubt unpleasant for the plaintiffs, the investigations did not involve any uncertainty beyond that faced by everyone who is a possible subject of a tort action. This is not the kind of uncertainty that the declaratory judgment action was created to end. Similarly, there was no real cloud over plaintiffs’ businesses, in contrast with Kalman v Shubert (supra). The purported cloud upon the Government securities market seems to be purely rhetorical. Although the sums lost in the West Virginia debacle amount to real money, they represent only a fraction of the $100-120 billion the New York market trades every day. Nor do the claims of defendants place the market itself or some essential element of it in issue; the charge rather is that plaintiffs’ agents simply gulled unsophisticated West Virginia officials in conversations with and representations made to them specifically.[5] If there is a cloud on the *296 market, it is, on plaintiffs’ showing, nowhere to be seen.
Remitting the dealers to their defenses in an out-of-State action is not improper. (See, Atlantic Mut. Ins. Co. v Cadillac Fairview US, 125 AD2d 181 [1st Dept 1986], lv denied 69 NY2d 613 [1987]; Canadian Imperial Bank v Canada Life Assur. Co., 43 AD2d 920 [1st Dept], appeal dismissed 34 NY2d 959, lv denied 35 NY2d 643 [1974].) Plaintiffs vehemently contend, however, that to do so in a case of this kind would run afoul of an important principle of public policy in this State, articulated in Ehrlich-Bober & Co. v University of Houston (49 NY2d 574 [1980]).
In Ehrlich-Bober, the plaintiff, a New York securities dealer, sued the University of Houston because of the latter’s alleged breach of reverse repurchase agreements. The transactions were initiated by phone calls to New York. The issue before the court was whether, as a matter of comity, New York should defer to a Texas statute that provided that suit against the university could be brought only in two counties in Texas. In answering this question in the negative, the Court of Appeals contrasted the administrative convenience Texas sought to advance by the statute with "New York’s recognized interest in maintaining and fostering its undisputed status as the preeminent commercial and financial nerve center of the Nation and the world” (49 NY2d, at 581.) This interest "naturally embraces a very strong policy of assuring ready access to a forum for redress of injuries arising out of transactions spawned here. Indeed, access to a convenient forum which dispassionately administers a known, stable, and commercially sophisticated body of law may be considered as much an attraction to conducting business in New York as its unique financial and communications resources.” (Supra, at 581.) The court concluded that in an action concerning a commercial transaction in New York over which the New York courts have jurisdiction, New York courts are not barred from exercising that jurisdiction because of sovereign immunity.
The course the dealers recommend so earnestly seems to me to require an extension of Ehrlich-Bober (supra) into territory the Court of Appeals had not surveyed. There, a State was purporting to oust New York of jurisdiction over the case of a New York plaintiff suing for a breach of contract suffered in New York. Here, the plaintiffs are not the injured parties but the alleged wrongdoers; the injury in this tort case was suffered in another State; and what the plaintiffs seek to do is *297 not so much to obtain a forum here as to escape one elsewhere. The effect of Ehrlich-Bober on the university was to force it to defend its alleged breach of the agreements in New York, where the injury occurred; the dealers, on the other hand, purport to bar the State and the Investment Board from suing in the State’s own courts (now, on removal, the Federal court) for an injury suffered in West Virginia. To follow the dealers’ reasoning would be to require exclusive New York jurisdiction for a large group of cases, both in contract and in tort, in damage suits by New York plaintiffs or in declaratory judgment actions by fleet-footed New York defendants, even where the injury was suffered out of State. I do not believe the Court of Appeals had such a result in mind.[6]
Furthermore, the dealers recognize that Ehrlich-Bober (supra) is a State court doctrine inapplicable in Federal court. Greater governance over the financial markets in New York is provided by Federal law than by State law. And yet, for example, securities fraud claims can be brought in any district in the country and, notwithstanding the possibility of nationwide cacophony in judicial rulings, the securities markets function. This suggests that disaster will not befall plaintiffs and the market in Government securities if the Ehrlich-Bober doctrine is not transformed into exclusive New York jurisdiction over cases involving the markets.
The dealers contend, however, that to send them to West Virginia would be to impose upon them a cruel and unfair fate. The dealers argue that traditional forum non conveniens factors compel retention of this case here. While the holding here is primarily founded on my jurisdiction over declaratory judgment actions and therefore I need not weigh these factors precisely as I would if the motion were being decided under CPLR 327, I have considered these factors in order to be sure that no injustice is done by sending plaintiffs to West Virginia.
The dealers emphasize that they, the plaintiffs, are residents of this State. Ordinarily this is a significant factor (Nevader v Deyo, 111 AD2d 548 [3d Dept 1985]), but the parties who appear first in the caption in this case are not *298 normal plaintiffs.[7] The dealers, citing Ehrlich-Bober (supra), argue that the transactions at issue occurred in New York. But this case is not based on an alleged breach of contract, as in Ehrlich-Bober. The trades that the Investment Board ordered did occur in New York. The defendants’ claim, however, concerns not the transactions themselves, but the relationship between representatives of the dealers and the Consolidated Fund’s money managers and the farmer’s alleged hoodwinking of the naive latter. The misrepresentations and wrongful solicitations occurred in West Virginia or were sent over phone lines into West Virginia. The injury was suffered in West Virginia by the loss of the Board’s funds.
The dealers argue that New York law governs the transactions since the transactions were effectuated in the New York market and many confirmations provide that New York law would govern. I will not resolve the choice of law question. I do note, however, that since the defendants’ claims are in tort the dealers’ argument is considerably more problematic than they let it appear.
Plaintiffs argue that the majority of witnesses reside in the New York area. The dealers refer to "dozens” of witnesses from this area whom they intend to rely upon. This group includes "numerous traders.” However, it is clear that the true witnesses will be that smaller group of persons at the three dealers who dealt with, and supposedly inveigled, the money managers, especially the key officials. It is comforting and worth noting that my brother from across the street, Judge Keenan, took the same view of the realities of the case.
As against this, eight persons from the Treasurer’s office will be witnesses in the case, all but one of whom reside in West Virginia. The members of the Investment Board and their aides, West Virginia residents, will also be witnesses. The key actors in the drama in the Treasurer’s office, Man-chin, Margolin and Lester, are apt to be uncooperative; the latter two are apparently unwilling to testify and are beyond the subpoena power of this court. Judge Keenan noted that the inconvenience to plaintiffs, large securities dealers engaged in a nationwide business, of producing witnesses in West Virginia is minimal and he concluded that the conve *299 nience factor tipped in favor of defendants. I am less certain of this than Judge Keenan since the plaintiffs also refer, quite reasonably, to their need to call witnesses from other dealers that had relationships with defendants in order to demonstrate the invalidity of defendants’ theories. However, again, the group in question will be more restricted than plaintiffs suggest. Although I think there are likely to be more New York witnesses on plaintiffs’ side than West Virginia ones on defendants’, the imbalance is not such as to require that I keep this declaratory judgment action here for reasons of convenience to plaintiffs’ witnesses. Nor is the location of documents a convincing argument in plaintiffs’ favor.
The largest and noisiest weapon deployed by the dealers on this aspect of the case concerns the "substantial risk [of] local bias.” The dealers have gone to elaborate lengths, including a detailed public opinion survey, to demonstrate that they cannot receive a fair trial in West Virginia. This survey is open to question in some technical respects (e.g., the percentage of responses, the form of the questions). Beyond that, the survey does reveal widespread familiarity with some aspects of the scandal, but this is hardly surprising. Nor is it astonishing that a survey would suggest that a panel of prospective jurors in West Virginia is more apt to contain jurors who have formed some views about the matter than is a panel in New York, where the scandal was not major news. The real question, though, is not whether there is knowledge of the case, but whether a panel of fair-minded jurors can be selected. (See, Patton v Yount, 467 US 1025, 1035 [1984].) The dealers, even if not guilty of "condescending parochialism”, as Judge Keenan found, have not convinced me that finding a jury that meets the test will be impossible or even unlikely.
The passions and notoriety surrounding this case will have dimmed by the time the matter comes to trial. (Patton v Yount, supra, 467 US, at 1032-1035.) Although loss of public moneys is at issue, the defendants’ charges of wrongdoing by the dealers are not such as by their nature engender the widespread and strong feelings that scandalous cases involving notorious persons do. I do not believe that the Federal court in West Virginia will be unable to insure a fair jury and a proper trial for plaintiffs. Certainly, the dealers are strong enough to protect their interests and urge their case, and their lawyers, three prestigious firms boasting among the most brilliant, skillful and resourceful attorneys in this Nation (the high quality of whose work is exemplified by their papers on *300 this matter), will see to it that their clients are furnished with a solid defense, in jury selection and everything else.
The preparation of a defense is what the plaintiffs herein ought to be about. Accordingly, the motion to dismiss is granted.

. Although the dealers complain that the State’s investigation into the investment fiasco dragged on for months, this action immediately followed a meeting requested by plaintiffs at a time when suit by defendants, though not finally decided upon, appeared imminent. Had the investigation proceeded very rapidly, defendants would have risked accusations from plaintiffs of bias, unfairness and an inadequate investigation. What seems to have upset plaintiffs is that defendants did not agree with plaintiffs’ assessment that the defendants have no case.

. Argonaut Ins. Co. v Occidental Petroleum Corp. (106 Misc 2d 5 [Sup Ct 1980]) and Rosenbaum v Melnikoff (15 Misc 2d 601 [Sup Ct 1958], affd 7 AD2d 975 [1st Dept 1959]), cited by the dealers, are also distinguishable. In the former, New York was the only place where the individual damage plaintiffs could be joined. In the latter, the New York trustee was not a party to the California actions and the issue in California was narrower than the one in New York.

. The court relied upon Broadview Chem. Corp. v Loctite Corp. (417 F2d 998 [2d Cir], cert denied 397 US 1064 [1970]). There the plaintiff was grappling with continuing uncertainty about its right to market certain products, the threat of contempt if it acted in error and the defendant’s threatening letters to plaintiff’s clients, the adverse effects of which were obvious.

. In view of this, there should be no magic in plaintiffs having gotten three days’ jump on defendants.

. Plaintiffs contended vigorously at oral argument that West Virginia’s claims placed in doubt the rules of the road for the Government securities market. But it appears to be otherwise. Plaintiffs insist that the relationship here was that of principal-to-principal, the customary relationship in this market; defendants do not challenge that relationship or assert that for some reason the market operates unfairly or unlawfully, but rather claim that, on the facts of this case, plaintiffs’ role was actually that of fiduciary and adviser rather than principal.

. At argument, plaintiffs sought to cast West Virginia’s claims as essentially contractual. The assertion was that the defendants made a deal and now simply wish to get out of it. This is hardly a fair characterization of defendants’ claims, which are unquestionably statutory and in tort. Whether or not these claims are wholly without basis in fact remains to be determined.

. Usually, the "heavy burden” of demonstrating that plaintiff’s choice of forum must be changed rests with the defendants. (Banco Ambrosiano, S. p. a. v Artoc Bank & Trust, 62 NY2d 65 [1984].) This, though, is not the usual case.