INTERPORT PILOTS AGENCY, INC., A Corporation of the State of New Jersey, Captain Charles Jonas, Captain Francis Burn, Jr., and Captain Philip Gaughran, Plaintiffs,

v.

S. Fraser SAMMIS, Robert Pouch and Board of Commissioners of Pilots of the State of New York, Defendants.

No. CV–90–4325 (ADS).

United States District Court, E.D. New York.

Sept. 28, 1991.

Evans, Osborne & Kreizman, Little Silver, N.J., for plaintiffs; Joel N. Kreizman, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Barrie Goldstein, Asst. Atty. Gen., New York City, for defendants.

## OPINION AND ORDER

SPATT, District Judge.

Whether the federal "boundary statute" and New York's Navigation Law together permit Connecticut-licensed pilots to navigate their vessels through the Long Island Sound, into or out of ports located in New York on the north shore of Long Island, is the gravamen of the present controversy. Claiming entitlement to do so prompted these Connecticut pilots to commence this declaratory judgment action to finally settle the issue between them and the State of New York.

The plaintiffs move pursuant to Fed. R.Civ.P. 56(a) for partial summary judgment on their first cause of action of the complaint seeking a declaratory judgment. Specifically, the plaintiffs seek a declaration as to their rights under 46 U.S.C. § 8501(b) and New York Navigation Law § 89–b.

For the reasons that follow, the Court finds that federal subject matter jurisdic-

tion exists and that the plaintiffs are entitled to a declaration that Connecticut-licensed pilots may navigate foreign-flag vessels and American vessels under register to or from New York ports located within the "boundary area" of the Long Island Sound.

## FACTUAL BACKGROUND

The material facts underlying this controversy, set forth below, are not in dispute.

The individual plaintiffs are ship pilots licensed by both the United States Coast Guard and the State of Connecticut. The corporate plaintiff, Interport Pilots Agency, Inc. ("Interport"), is the pilot agency of which the individual plaintiffs are members.

The defendant, Commissioners of Pilots of the State of New York ("Board of Commissioners"), is a public entity constituted pursuant to section 87(1) of New York's Navigation Law. The individual defendants, S. Fraser Sammis ("Sammis"), and Robert Pouch ("Pouch"), are the President and Secretary, respectively, of the Board of Commissioners.

Sound Pilots, Inc. ("Sound Pilots"), is an association based in Newport, Rhode Island, which acts as a dispatching agent assigning pilots to ships through a rotation system. Presently there are fifteen pilots licensed by the Board of Commissioners to be "Long Island–Block Island Sound" pilots, each of whom are members of Sound Pilots.

Under the present procedure, once assigned to a vessel, the New York-licensed pilots meet foreign-flagged and American vessels under register, board the vessels from their pilot boat, and advise the master in navigating to or from the New York ports. A "master" is one who has "charge, control or direction of a vessel" for a specified period of time (N.Y. Navigation Law § 2[9]). A "pilot", is an "individual licensed to take charge of the course of a vessel through or upon specific waters" (N.Y. Navigation Law § 2[10]).

The rationale underlying the system is that these licensed pilots have the expertise and familiarity with local waters and conditions to properly navigate the vessels to one of Long Island's three ports, namely, Port Jefferson, Northville and Northport (Sammis Aff't ¶ 7).

Toward the end of 1990, Sound Pilots informed the defendant Board of Commissioners that the plaintiff Captain Jonas had met the vessel "Hoegh Forum" at the eastern end of the Long Island Sound and piloted this vessel to and from the Northville platform without a New York pilot. Captain Jonas, a Connecticut-licensed pilot, does not deny that he was the pilot on this voyage (see Jonas Aff't ¶ 7).

On November 5, 1990, the Board of Commissioners issued a letter to various state pilot groups, including Sound Pilots, stating that it was a violation of New York pilotage law (i.e., Navigation Law § 89–b[1]) for a foreign flag tank vessel to be piloted into the New York waters of the Long Island Sound via the eastern end, bound for the Northville platform, without a New York-licensed pilot aboard.

Sound Pilots, by Captain Bruce B. Fisher, later advised the Board of Commissioners by letter dated January 17, 1991, of seven other alleged instances of Connecticut-licensed pilots navigating through the Long Island Sound to and from New York ports. Because of the pendency of this lawsuit, the Board of Commissioners refrained from taking any further action on these alleged violations (Sammis Aff't ¶ 10).

The plaintiffs commenced this action contending that the Board of Commissioners' position in the November 5, 1990 letter is contrary to both federal and state law. Specifically, the plaintiffs contend that they have full authority by virtue of federal law to pilot vessels through the New York State waters of the Long Island Sound to and from New York-based ports, such as Port Jefferson, and the Northville and Northport platforms in those waters.

The Complaint alleges four causes of action. The first cause of action seeks a declaration that the plaintiff Interport's pi-

lots may navigate through the New York waters of the Long Island Sound to bring vessels to and from New York ports without a New York pilotage license. The second and third causes of action allege constitutional violations under 42 U.S.C. § 1983. The fourth cause of action alleges a pendent state-law cause of action based upon interference with prospective economic advantage.

The plaintiffs now move for partial summary judgment on the first cause of action only.

In opposition, the defendant Board of Commissioners contends that pursuant to section 89–b(1) of New York's Navigation Law, only pilots licensed by New York may navigate to and from New York ports through the New York waters of the Long Island Sound.

## APPLICABLE LAW

(a) *Federal Subject Matter Jurisdiction:*

At the outset, even though not raised in the parties' papers, the Court must, as in any case or controversy, determine whether federal subject matter jurisdiction exists (*see* Fed.R.Civ.P. 12[h][3]; *Browning–Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 159 [2d Cir.1990]; *Republic of the Philippines v. Marcos*, 806 F.2d 344, 352 [2d Cir.1986], *cert. dismissed sub nom. Ancor Holdings, N.V. v. Republic of the Philippines*, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784, *cert. denied sub nom. New York Land Co. v. Republic of the Philippines*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 [1987]; *see generally* P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1703 [3d ed. 1988] [court has continuing duty to ensure jurisdiction exists]).

The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, provides, in pertinent part, as follows:

> "[i]n a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration ..." (28 U.S.C. § 2201).

■ Significantly, the Act itself merely creates a *remedy* of declaratory relief, and does not create or confer federal subject matter jurisdiction over an action that would not normally come within the Court's original jurisdiction. That is, there must be an independent basis of federal jurisdiction before the Court may render a declaratory judgment (*see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2766 [1983 & Supp.1991] [discussing operation of the Act and independent jurisdictional requirement]).

The complaint in this action specifically seeks relief under 42 U.S.C. § 1983, on the ground that the defendants, acting "under color of state law", denied the plaintiffs due process by not affording them a hearing before refusing to allow the pilots access to New York ports. In addition, the complaint alleges that the actions of the defendants in denying access to the New York ports of the Long Island Sound has caused ship owners to cease doing business with the plaintiffs.

■ "Consideration of the issue of jurisdiction is not equivalent ... to an evaluation of the merits of a party's federal claim" (*Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 99 [2d Cir.1990]; *see also Spencer v. Casavilla*, 903 F.2d 171, 173 [2d Cir.1990]). The test is whether the claim "is so patently without merit" so as to justify dismissal based on jurisdictional grounds (*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–2629, 57 L.Ed.2d 595 [1978] [citing cases]). Clearly, federal jurisdiction over the claims set forth in this action exists pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

Before proceeding to the merits of the instant motion, however, the Court must also be satisfied that there is truly a "substantial controversy" to justify relief under the Declaratory Judgment Act in light of the mandate against the issuance of adviso-

ry opinions. Such a determination may only be properly made on a case-by-case basis (*see Salomon Bros. v. Carey*, 556 F.Supp. 499, 501 [S.D.N.Y.1983]).

█ "Congress established the declaratory judgment procedure so that parties who were uncertain of their rights could adjudicate their claims without first engaging in dubious conduct" (*Penguin Books USA Inc. v. Walsh*, 929 F.2d 69, 72 [2d Cir.1991]). The federal court's "ability to pass on the future rights and relations of parties, however, is not without significant constitutional and statutory limits. A federal court lacks the power to render advisory opinions and the authority 'to decide questions that cannot affect the rights of litigants in the case before them'" (*id. quoting North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 [1971]). The decision to grant declaratory relief rests in the sound discretion of the district court (*see Christopher P. v. Marcus*, 915 F.2d 794, 802 [2d Cir.1990], *cert. denied*, —— U.S. ——, 111 S.Ct. 1081, 112 L.Ed.2d 1186 [1991]), and the question in each case " 'is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment'" (*Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 [2d Cir.], *cert. denied*, —— U.S. ——, 111 S.Ct. 2829, 115 L.Ed.2d 998 [1991], *quoting Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 [1969] [other citations omitted]).

As stated above, on November 5, 1990, the Board of Commissioners issued a letter to Sound Pilots stating that it was a violation of New York Navigation Law § 89–b(1) for a foreign-flag tank vessel to be piloted into the New York waters of the Long Island Sound via the eastern end, bound for the Northville platform, without a New York-licensed pilot aboard. Plaintiff Captain Jonas admits having docked and undocked vessels at the Northville and Northport platforms in New York (*see* Jonas Aff't ¶ 7). Sound Pilots subsequently advised the Board of Commissioners of other alleged instances of Connecticut-licensed pilots navigating through the Long Island Sound to New York ports. In addition, in light of the commencement of this lawsuit, the Board of Commissioners has since refrained from taking further action on these alleged violations, until the issue is decided by this Court (Sammis Aff't ¶ 10).

The plaintiffs' recourse to the Declaratory Judgment Act is the proper procedure under the circumstances, since a declaratory judgment "will serve a useful purpose in clarifying and settling the legal relations in issue, and ... will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding" (*Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 [2d Cir.1986] [citations omitted]). In this Court's view, there exists a real and immediate controversy between the parties who have adverse legal interests. The plaintiffs are seeking to establish that they have an affirmative federal right under the boundary statute to navigate to ports located in New York within the Long Island Sound, without having to first obtain a New York license.

Accordingly, based upon the foregoing, the Court finds that federal jurisdiction exists over the claims raised, and the issuance of a declaratory judgment may properly be considered.

(b) *The Federal Boundary Statute and New York's Navigation Law:*

█ In 1824, Chief Justice John Marshall held that the federal statute governing the licensing of vessels granted those ships the right to engage in coastal trade and, accordingly, invalidated the grant by New York of a steamboat monopoly to a private company (*see Gibbons v. Ogden*, 22 U.S. [9 Wheat.] 1, 6 L.Ed. 23 [1824]). In so ruling, Chief Justice Marshall carefully examined the scope of both federal and state powers under the commerce clause, and the broadly read Congressional power under that clause.

Subsequent to *Gibbons v. Ogden*, the Supreme Court held that Congress has the

power to regulate navigation that occurs within the *internal* waters of the states (*see Cooley v. Board of Wardens of the Port of Philadelphia*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 [1852]). Congress has, however, expressly chosen not to exercise this power, specifically leaving such regulation to the several states:

"(a) Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States" (46 U.S.C. § 8501[a]).

A statutory exception to this is contained in the federal "boundary statute". Pursuant to the boundary statute, states share this retained power when their ports are situated upon waters that form the boundary between the two states:

"(b) The master of a vessel entering or leaving a port on waters that are a boundary between 2 States, and that is required to have a pilot under this section, may employ a pilot licensed or authorized by the laws of either of the 2 States" (46 U.S.C. § 8501[b], formerly codified at 46 U.S.C. § 212).

As of January 1, 1972, the State of New York regulated and required the licensing of pilots who navigate vessels on the New York waters of the Long Island Sound as they make their way to and from New York ports which are situated on the Sound (*see* N.Y. Navigation Law § 89–b[1]; *see also Kennedy v. Board of Commissioners of Pilots*, 41 A.D.2d 173, 341 N.Y.S.2d 490 [1st Dep't 1973]). Section 89–b(1) provides, in relevant part, that:

"[e]very foreign vessel and every American vessel transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point, and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point, *shall take a Long Island–Block Island Sound pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters* ..." (emphasis supplied).

State pilotage laws, such as section 89–b of the Navigation Law, apply only to foreign-flag vessels and American vessels under register (*i.e.*, engaged in foreign trade), and are inapplicable to American vessels engaged solely in the domestic coasting trade (*see Anderson v. Pacific S.S. Co.*, 225 U.S. 187, 199, 32 S.Ct. 626, 630, 56 L.Ed. 1047 [1912]; *see also* N.Y. Navigation Law § 89–b[1] ["Every foreign vessel and every American vessel under register...."]).

With this statutory scheme in mind, the Court turns to the instant controversy.

## DISCUSSION

The plaintiffs are licensed by the State of Connecticut to navigate through the Long Island Sound to bring vessels to and from Connecticut ports only. Similarly, New York licenses its pilots to navigate only to New York ports on the Long Island Sound. It is undisputed that neither state specifically licenses its pilots to navigate on the waters of its sister state for purposes of entering and departing such ports. The plaintiffs contend, however, that the federal "boundary statute" (46 U.S.C. § 8501[b]), affords Connecticut-licensed pilots the right to navigate vessels to and from New York ports which are situated on the New York waters of the Sound, notwithstanding the existence of section 89–b of New York's Navigation law.

Although the defendants do not dispute the existence of "the right of a Connecticut-licensed pilot to navigate on the Long Island Sound in transit to or from Connecticut ports" (*see* Defendants' Memorandum of Law in Opposition at p. 8), they do strenuously oppose the plaintiffs' contention that they are entitled, under the federal boundary statute, to enter or leave New York ports on the Sound.

Despite the vintage of the federal boundary statute, the issue before this Court involving these waters is apparently one of first impression: namely, whether the federal boundary statute as applied to Connecticut-licensed pilots, permits those pilots to port at New York platforms located within the waters of the Long Island

Sound, notwithstanding section 89–b of New York's Navigation Law, which requires every vessel to take a "Long Island–Block Island Sound pilot licensed under [New York law] or of the laws of any other state having concurrent jurisdiction over these waters".

In reaching a determination on the construction to be accorded these two statutes, the Court is mindful of the fundamental rule of statutory construction that when the language of a statute is unambiguous, the Court should give effect to its "plain meaning" (see Samuels, Kramer & Co. v. Commissioner of Internal Revenue, 930 F.2d 975, 979 [2d Cir.1991]; In re Chateaugay Corp., 920 F.2d 183, 184 [2d Cir.1990]). That is, the words of the statute should be accorded their "ordinary, contemporary, common meaning" (Perrin v. United States, 444 U.S. 37, 43, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 [1979]). The rule is no different in construing New York state statutes (see, e.g., Schmidt v. Roberts, 74 N.Y.2d 513, 548 N.E.2d 1284, 549 N.Y.S.2d 633 [1989]; see also N.Y. Statutes Law § 94).

■ The federal boundary statute specifically states that a vessel entering or leaving a port on waters that are a "boundary" between two states, may employ a pilot licensed or authorized by the laws of either of the two states (46 U.S.C. § 8501[b]). In this Court's view, this plain language permits either New York or Connecticut pilots to enter or leave ports located in Connecticut or New York, at least as to those ports that are located within the boundary waters of the two states.

Although relatively few cases have construed either section 8501(b) or its predecessor section 212, a review of the available precedent is warranted.

In The Clymene, 9 F. 164 (E.D.Pa.1881), aff'd, 12 F. 346 (C.C.Pa.1882), a Delaware-licensed pilot sought to navigate a vessel through the Delaware River into Philadelphia, Pennsylvania, despite that he had not held a Pennsylvania license as required under Pennsylvania law. The pilot commenced the action to recover pilotage fees

allegedly owed to him upon the refusal of the master of the vessel to pay the pilot for his services.

Construing former section 212 (now section 8501[b]), the court held that even though the state of Delaware did not physically border the river where the Philadelphia port was located, a Delaware license was sufficient for pilotage from Delaware to Philadelphia. The court concluded as follows:

"the libellant was a duly licensed pilot, authorized to do what he undertook; and that any law of Pennsylvania designed to interfere with him in this respect, is inoperative and void. It also follows that the provision of the Delaware statute, which contemplates an exclusive jurisdiction over the subject on waters within her limits ... is equally inoperative and void" (9 F. at p. 168) (emphasis supplied).

In Leech v. Louisiana, 214 U.S. 175, 29 S.Ct. 552, 53 L.Ed. 956 (1909), the Supreme Court upheld the conviction of a Mississippi-licensed pilot for piloting a foreign vessel from the Gulf of Mexico up the Mississippi River to New Orleans, since the pilot operated without a Louisiana license. The Court reasoned that the Mississippi River from the Gulf to New Orleans lay solely within the state of Louisiana. In dicta, however, the Court noted that the result might be different if the ultimate destination of the vessel were to a port situated further north within the state of Mississippi.

In The Glenearne, 7 F. 604 (D.Or.1881), involving a suit to recover unpaid pilotage fees, the court stated that either a Washington- or Oregon-licensed pilot could navigate the vessel at issue through the Columbia River which acts as a boundary between the two states, but that only an Oregon pilot could navigate while on the Wallamet River, which lies solely within the State of Oregon.

What can be gleaned from these early decisions is that the federal boundary statute applies when, as the statute clearly states, waters form a "boundary" between two states, and the effect is that a master

of a vessel may employ a pilot licensed under the laws of *either* state to enter or leave ports of either state.

Relying on the boundary statute (former section 212), the New York Attorney General rendered a formal opinion that a Connecticut-licensed pilot may *transit* the New York waters of Long Island Sound from a Connecticut port to Execution Rocks in the western portion of the Sound (1986 Op. N.Y. Att'y Gen. F5). Specifically, Attorney General Robert Abrams stated that:

"There is no question that the Long Island Sound acts as the boundary between New York and Connecticut, and that pilots from either state may navigate those portions of the Sound which acts as the boundary between the states. If a north-south line is drawn from the westernmost point in Connecticut which borders Long Island Sound, however, it becomes apparent that a portion of the Sound does not act as a boundary between the states, but rather, acts as a boundary between the counties of Nassau and Westchester. Your question is whether this area is included under the alternate pilotage provisions found in 46 U.S.C. § 212.

\* \* \* \* \* \*

We conclude that a pilot duly licensed by the State of Connecticut and the Federal government may: (1) pilot a vessel through the New York waters of Long Island Sound; and (2) pilot a vessel from a Connecticut port to Execution Rocks in western Long Island Sound."

Thus, in the opinion of the New York Attorney General, the Long Island Sound acts as a boundary between the states of Connecticut and New York, and as such, a Connecticut pilot may navigate through the New York waters of the Long Island Sound. The issue not discussed by the Attorney General, however, is whether these pilots may proceed to enter and leave New York ports. In this regard, the defendants apparently do not dispute that the Long Island Sound acts as a boundary between New York and Connecticut (*see, e.g.,* Sammis Aff't, Ex. B [map of the waters of the Long Island Sound depicting the two states' boundary lines]).

Pursuant to New York's Navigation Law, foreign vessels and American vessels under register traversing the New York state waters of Long Island Sound east of Execution Rocks, "and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point", must take a New York-licensed pilot *or* a pilot licensed by *"any other state having concurrent jurisdiction over these waters"* (N.Y. Navigation Law § 89–b[1] [emphasis supplied]). As Attorney General Abrams notes in 1986 Op. N.Y. Att'y Gen. F5, "[t]here is no question that the Long Island Sound acts as the boundary between New York and Connecticut". Thus, Connecticut *is* a state having concurrent jurisdiction over these waters.

The federal boundary statute specifically states that a vessel entering or leaving a port on waters that are a "boundary" between two states, like the Long Island Sound, may employ a pilot licensed or authorized by the laws of *either* of the two states, namely, New York *or* Connecticut (46 U.S.C. § 8501[b]).

In sum, in this Court's view, the plain, clear and unambiguous meaning of *both* the federal boundary statute and section 89–b of the Navigation Law is that the Long Island Sound at the Northville, Northport and Port Jefferson ports, acts as a boundary between the two states of New York and Connecticut. The ports of Northville, Northport and Port Jefferson in New York are all located within the boundary waters of the Sound, over which both states may properly exercise concurrent jurisdiction. Therefore, following the clear language of both statutes, any vessel entering or leaving a port from Connecticut or New York in this boundary area, where there is concurrent jurisdiction, may employ *either* a New York- or Connecticut-licensed pilot.

Contrary to the defendants' contentions, this reading does not conflict with the operation of the Navigation Law, since that law expressly provides that vessels entering or

departing from any New York port of the Long Island Sound east of Execution Rocks must take a New York-licensed pilot *or a pilot licensed by "any other state having concurrent jurisdiction over these waters"* (N.Y. Navigation Law § 89–b[1] [emphasis supplied]). Since the Long Island Sound is a boundary between Connecticut and New York, both states have concurrent jurisdiction over such waters of the Sound, and therefore, a Connecticut-licensed pilot is permitted by both federal and New York state statutes to navigate a vessel entering or leaving a New York port.

This construction reconciles any alleged inconsistency between the statutes and affords a harmonious, consistent and effective co-existence of the provisions of both the federal boundary statute and the New York Navigation Law. As so interpreted, it also furthers the intent underlying the enactment of section 8501 and its predecessors, which is to prevent "pilotage wars" between neighboring states by each state attempting to secure an exclusive privilege for the benefit of its pilots (*see Reardon v. Arkell*, 59 F. 624, 625 [S.D.N.Y.1894]; *The Abercorn*, 26 F. 877, 879 [D.Or.], *aff'd*, 28 F. 384 [C.C.Or.1886]; *The Clymene, supra*, 9 F. at pp. 166–67).

The defendants' theoretical distinction between merely "transiting" the waters of the Long Island Sound, and "entering or leaving" New York ports located within the boundary waters of the Sound, is rejected as having no legal significance. The Court notes that there is no distinction made between "transiting" and "entering" or "leaving" a port with respect to the issuance of a New York license, nor does federal or state law create such a distinction.

Finally, the defendants' contention that environmental and safety considerations require that only New York pilots be permitted to enter and leave New York ports since they are more familiar with local conditions than Connecticut pilots, is without merit.

## CONCLUSION

Based upon the foregoing, the motion of the plaintiffs pursuant to Fed.R.Civ.P.

56(a) for partial summary judgment on the first cause of action for a declaratory judgment is granted. The Court declares that pursuant to 46 U.S.C. § 8501(b), and New York Navigation Law § 89–b, Connecticut-licensed pilots may be employed by foreign-flag vessels and American vessels under register transiting New York waters of the Long Island Sound which form a boundary between New York and Connecticut, and may specifically enter and leave ports located at Northville, Northport and Port Jefferson. Further, such persons may pilot those vessels to and from those New York ports without being required to first obtain a New York license.

The parties are directed to appear before this Court for a conference on October 28, 1991 at 8:00 a.m., to discuss the disposition of the remaining issues in the case, if any.