**INTERPORT PILOTS AGENCY, INC., Charles Jonas, Captain, Francis Burn, Jr., Captain, Philip Gaughran, Captain, Plaintiffs–Appellants–Cross–Appellees,**

v.

**S. Fraser SAMMIS, Robert Pouch, Defendants–Appellees,**

**Board of Commissioners of Pilots of The State of New York, Defendants–Appellees–Cross–Appellants.**

**Nos. 454, 643, Dockets 93–7499L, 93–7573XAP.**

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1993.

Decided Jan. 10, 1994.

Joel N. Kreizman, Little Silver, NJ (Evans, Osborne & Kreizman, of counsel), for plaintiffs-appellants-cross-appellees.

Barrie L. Goldstein, New York City (Robert Abrams, Atty. Gen. of the State of New York, Andrea Green, Deputy Sol. Gen., of counsel), for defendants-appellees-cross-appellants.

Before: McLAUGHLIN, JACOBS and REAVLEY,* Circuit Judges.

JACOBS, Circuit Judge:

On this appeal this Court has occasion for the first time to construe the Federal Boundary Waters Act, enacted in 1837 and codified in its current version at 46 U.S.C. § 8501(b) (1989) (the "boundary statute"). The boundary statute allows vessels entering or leaving a port on waters that are a boundary between two states to use a pilot licensed by either state. Connecticut-licensed pilots assert a right under the boundary statute to pilot ships to New York ports on Long Island Sound, and are protesting their treatment at the hands of New York authorities, who claim that the boundary statute does not apply to Long Island Sound and therefore confers no entitlement on the Connecticut pilots. The Connecticut pilots also allege violations of their substantive and procedural due process rights, actionable under 42

* Honorable Thomas M. Reavley, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

U.S.C. § 1983, and a common law claim for tortious interference with prospective economic advantage.

In the district court, the Connecticut pilots secured a declaration of their right under the boundary statute to pilot ships to New York ports on Long Island Sound, but lost on all other claims. These appeals ensued, and for the reasons stated below, we affirm the judgment.

## BACKGROUND

Plaintiffs are Interport Pilots Agency, Inc. ("Interport"), an organization of ship pilots, and three Interport members who are licensed as pilots by the State of Connecticut and the federal government (the "Connecticut pilots"). None of Interport's members is licensed by the State of New York. Defendants are the Board of Commissioners of Pilots of the State of New York, its President and its Secretary (collectively, the "Board"). In 1988, Interport and the Connecticut pilots began to challenge the Board's policies concerning pilotage in Long Island Sound, which policies allegedly excluded the Connecticut pilots from assignments aboard ships seeking to navigate to and from New York ports on the Sound. After the Connecticut pilots began offering ships pilotage services to New York ports through a shorter route than that traditionally used by New York pilots, the New York Board issued notices which had the effect of discouraging shippers from using the services of the Connecticut pilots. Plaintiffs brought this suit, claiming that the Board's actions violated the federal boundary statute and plaintiffs' due process and economic rights.

The district court granted partial summary judgment in favor of plaintiffs, declaring that the boundary statute authorizes the Connecticut pilots to navigate Long Island Sound to and from New York ports. 774 F.Supp. 734 (E.D.N.Y.1991). On the ground of qualified immunity, the district court subsequently dismissed the claims asserted against the individual defendants in their personal capacity. The case proceeded to a jury trial. At the close of the evidence, the district court directed a verdict for the Board on the substantive due process claim and the common

law claim. The only issue submitted to the jury was plaintiffs' claim that they were deprived of procedural due process. The jury returned a verdict for the Board, but plaintiffs contend that the jury instructions were erroneous. Plaintiffs' motion for a new trial was denied. A final judgment issued and plaintiffs noticed this appeal as to the dismissal of both due process claims. The Board has cross-appealed the award of declaratory relief.

Pilotage is the art of navigating ships into and out of ports or along rivers, bays, harbors and other special waters. By legislation initially enacted in 1789, Congress determined to leave regulation of pilotage for the most part to the states. *See* Act of August 7, 1789, ch. 9, § 4, 1 Stat. 54. That provision now reads:

> Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States.

46 U.S.C. § 8501(a) (1989). Congress has preempted state regulation of pilotage only with respect to vessels on the Great Lakes, 46 U.S.C. § 9302 (1989), and American flag vessels sailing between American ports ("coastwise vessels"). 46 U.S.C. § 8502 (1989). Thus, the states have authority over the pilotage of all American vessels sailing under register, that is, engaged in foreign trade, and all foreign flag vessels (jointly, "registered vessels").

The one limitation on each state's unilateral control over pilotage of registered vessels in its waters is the Federal Boundary Waters Act:

> The master of a vessel entering or leaving a port on waters that are a boundary between 2 States, and that is required to have a pilot under this section, may employ a pilot licensed or authorized by the laws of either of the 2 States.

46 U.S.C. § 8501(b). Neighboring states therefore share the power to regulate pilotage as to ports situated on waters that are a boundary between them. One assumed objective of the statute is to avoid "pilotage wars" between adjacent states, with each

state attempting to appropriate for its pilots some exclusive privilege or advantage in a bay or harbor.[1] *See Reardon v. Arkell,* 59 F. 624, 625 (S.D.N.Y.1894); *The Abercorn,* 26 F. 877, 879 (D.Or.), *aff'd,* 28 F. 384 (C.C.Or. 1886); *The Clymene,* 9 F. 164, 166–67 (E.D.Pa.1881), *aff'd,* 12 F. 346 (C.C.Pa.1882); 1986 N.Y.Op. Att'y Gen. (86–F5) 22, 23.

Under the authority given it by Congress, New York enacted the Navigation Law in 1853, creating the Board of Commissioners of Pilots to regulate pilotage practices, fees and licensing. *See* 1853 N.Y.Laws, ch. 467, § 1. Its dominion was initially limited to navigation of New York Harbor by way of Sandy Hook. The Board instituted a pilotage system which requires the exclusive use of a New York-licensed pilot while in those New York waters. *See id.,* § 10. Vessels that fail to use a New York pilot when required to do so are nonetheless liable for pilotage fees and may be fined. In 1959, the Legislature authorized the Board to regulate pilotage on the Hudson River, and the Board accordingly extended the exclusionary licensing scheme. *See* 1959 N.Y.Laws, ch. 676, § 7. Finally, in 1971, the Legislature extended the Board's jurisdiction to pilotage on Long Island Sound, the last unregulated inland body of water along New York's coastline. *See* 1971 N.Y.Laws, ch. 942, § 1, codified at N.Y.Nav. Law § 89–b (McKinney's 1989 & Supp.1993). This legislation also allowed for the grandfathering of all pilots, including Connecticut-licensed pilots, who were actively engaged in the occupation and who were found qualified under the Board's then existing regulations. *See* N.Y.Nav.Law § 91–b(2) (McKinney's 1989).

Navigation Law § 89–b specifically addresses the pilotage of registered vessels transiting Long Island Sound as they make their way to and from the three New York ports situated on the Sound (Port Jefferson and the oil platforms of Northville and Northport). At all times relevant to this appeal, section 89–b(1) provided in pertinent part:

Every foreign vessel and every American vessel under register transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point, and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point, shall take a Long Island–Block Island Sound pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters.

The New York pilotage system is based on the assumption that only New York-licensed pilots have the expertise and familiarity with local waters and conditions to navigate safely. The Board claims that New York employs licensing standards stricter than those for a federal license, and points out that a Connecticut license is issued to any pilot with a federal license. The Board also justifies its licensing policies as a means of affording New York pilots a living wage and avoiding "destructive competition" among pilots to get business by promoting shorter, more hazardous routes. Accordingly, pursuant to the Navigation Law, the Board strictly limits the number of New York-licensed pilots. As traffic to New York ports has declined over the years, so has the number of pilots authorized by the Board to take pilotage assignments in the geographical areas within its jurisdiction.

As to Long Island Sound, 17 pilots are currently authorized to navigate ships to and from New York ports, and the Board maintains a long, stagnant waiting list. These 17 pilots are all members of a single association of New York-licensed pilots, now called Sound Pilots, Inc. ("Sound Pilots"), appointed by the Board to act as the dispatching agent for Long Island Sound. Sound Pilots has established a rotation system for pilotage assignments, and controls the selection of new pilots to enter the rotation.

Sound Pilots' rotation initially included Interport members who, although not licensed in New York, were allowed to pilot ships to

---

1. The Board rejects this historical explanation and argues that the boundary statute was intended solely to remedy a temporary pilotage shortage. The boundary statute is succinct, intelligible and specific, however, and we have no call to consult legislative history.

138

New York ports on the Sound under the grandfathering provisions of Navigation Law § 91–b(2). For a number of years, these Interport members received approximately 25 percent of the pilotage assignments to registered vessels entering and leaving New York ports on the Sound. As these individual members retired or left, the Interport slots in the rotation system were eliminated. By 1987, no Interport member was included in Sound Pilots' rotation. None of the remaining Interport pilots was licensed in New York. The Connecticut pilots claim they were impeded in their efforts to obtain New York licenses. They point to their years of experience using their federal licenses to pilot coastwise vessels in New York and Connecticut waters of Long Island Sound—pilotage not subject to state regulation, see 46 U.S.C. § 8502—and argue that they are as qualified and experienced as the New York pilots to participate in Sound Pilots' rotation.

In 1988, plaintiffs founded Connecticut State Pilots as a division of Interport. Acting on their contention that the federal boundary statute divested New York of any authority to prohibit or regulate such activity by Connecticut pilots, they began offering pilotage services to registered vessels heading to New York ports on Long Island Sound. At the time, the established route for registered vessels entering Long Island Sound was to steer a course northeast of Block Island and meet a pilot at Point Judith, Rhode Island, where Sound Pilots' station is located. A New York-licensed pilot assigned by Sound Pilots would then board the vessel and navigate a westerly course through the Sound, which often entailed some backtracking of the ship's progress. In order to compete with Sound Pilots, plaintiffs invested in a pilot boat larger than any other pilot boat operating out of the eastern end of Long Island or neighboring Rhode Island. The larger boat enabled the Connecticut pilots to wait for ships at the Montauk pilot station and then use the Montauk–Block Island Channel en route to ports on Long Island Sound. This route allowed ships approaching from the south to save one to two hours of steaming time because they no longer would have to travel the extra northeastern leg to meet the Sound Pilots' boat at Point Judith.

The Board reacted with alarm, claiming that the Montauk–Block Island Channel is known for heavy seas, adverse currents and numerous shoals, and that the Connecticut pilots' use of the Channel is hazardous to navigation and the environment. Apparently, the Channel had been used infrequently ever since an oil tanker attempting to traverse it ran aground in 1970. The record also indicates that the Channel had not been charted in approximately 60 years. In March 1988, the Board communicated with Connecticut's Deputy Commissioner of the Bureau of Water Transportation, the state official responsible for Connecticut's pilotage policies, and attempted to persuade him to instruct Connecticut pilots not to use the Montauk–Block Island Channel. The Connecticut Deputy Commissioner responded that he had no authority to act because the Channel itself is in international waters. In November 1988, the Board issued a directive to all New York-licensed pilots not to use the Montauk–Block Island Channel. In December 1988, the Board issued a policy statement to shipping agents serving vessels in the Long Island–Block Island Sound area discouraging use of the Montauk–Block Island Channel. The Board had never before issued a statement about a navigational hazard to shipping agents.

Over the next year, Interport and the Connecticut Deputy Commissioner criticized the Board's actions and attempted to change the Board's opinion as to the dangers of the Montauk–Block Island Channel, arguing that it was no less safe than other shipping lanes and that Interport had never had an accident in the Channel. The Board corresponded with both critics and met with representatives of Interport, without resolving this disagreement. If anything, the Board's safety and environmental concerns were heightened at this time by the *Exxon Valdez* disaster in March 1989. Although the Coast Guard had opined in 1989 that the Montauk–Block Island Channel is navigable, the Coast Guard in January 1990 asked officials of Connecticut, New York and Rhode Island to draft uniform policies on the use of the Channel.

The states met on several occasions for that purpose, and a public hearing, attended by Interport, was held on the subject on May 1, 1990. The record does not show what came of this effort.

The Board's other response to the Connecticut State Pilots venture was to levy New York pilotage fees, pursuant to Navigation Law § 89–b(1), against vessels that used Connecticut pilots to navigate to New York ports. In May 1989, a Connecticut-licensed pilot met the tanker *Dan Frigg* at Point Judith and escorted the ship to and from the Northport oil platform. In accordance with instructions from the Board, Sound Pilots took the position that the voyage required a New York-licensed pilot and wrote to the vessel's operator demanding payment of pilotage fees. The vessel refused to pay, citing the federal boundary statute as authority for using a Connecticut pilot. Sound Pilots later advised the Board as to seven additional instances involving Connecticut-licensed pilots who navigated vessels to and from New York ports on Long Island Sound. Because of the pendency of this lawsuit, the Board refrained from taking any further action on these alleged violations.

In support of its position on pilotage fees, the Board developed and refined the view that the federal and state statutory schemes conferred on New York exclusive jurisdiction over pilotage to New York ports on Long Island Sound. No court or other governmental authority had ever issued any binding interpretation of the law to the contrary. The New York Attorney General in 1986 had rendered a formal opinion interpreting the federal boundary statute, and concluded that a Connecticut pilot may navigate a vessel through the New York waters of Long Island Sound, and between a Connecticut port and Execution Rocks in Western Long Island Sound. 1986 N.Y.Op.Att'y Gen. (86–F5) at 22–23. However, the Attorney General did not discuss whether Connecticut pilots may proceed to enter and leave New York ports. The Board unsuccessfully invited the Attorney General to reconsider his position, based in part on the perceived environmental hazard arising out of supposedly less-experienced pilots navigating New York waters in the Sound.

The Board also conferred repeatedly with counsel as to the import of the boundary statute, and embraced the advice that a Connecticut pilot would not be entitled to navigate to and from a particular New York port unless an endorsement for that port was placed on his Connecticut pilot's license. Since Connecticut has no authority to issue endorsements for New York ports, and since the Board had not endorsed any Connecticut licenses, the Board concluded that no basis existed for any Connecticut pilot to navigate vessels to and from New York ports. The Board analogized the dispute over pilotage in the Sound to the historical conflict between New York and New Jersey pilots in Sandy Hook, which had been resolved by a "concurrency agreement" between the two states providing for uniform pilotage regulations in that body of water. The Board considered its position validated by the fact that no concurrency agreement exists between New York and Connecticut for Long Island Sound.

On November 5, 1990, reacting to a report that a Connecticut pilot navigated the vessel *Hoegh Forum* through Long Island Sound to the Northville platform, the Board issued a policy statement to its pilots, with copies to various New York and Connecticut state officials, which formally articulated its view of its statutory authority. The statement reads in pertinent part:

> [I]t is the position of the Board that state pilotage is mandatory on all foreign flag vessels and American flag vessels under Register. Owners would do well to bear in mind and should be reminded that a violation of the pilotage law, particularly in the event of an accident, could have extreme consequences if it were determined that an Owner knowingly violated the state's pilotage or other laws with respect to operations or navigation. . . .
>
> . . . .
>
> . . . [I]t is illegal for a non-New York state pilot to take a vessel from the Eastern end of the Sound, through New York State waters, into a New York state port,

under the scope of the laws of the State of New York and our existing regulations. The statement concludes with a request that New York pilots alert the Board to any violations of this policy. Plaintiffs claim that the Board should have notified them and given them an opportunity to be heard before issuing the November 5 policy statement. Plaintiffs suffered a loss of pilotage business as a result of the policy statement, and filed this lawsuit.

These appeals present three broad issues: (1) whether Connecticut-licensed pilots have a right under the federal boundary statute to provide their services to registered vessels bound to or from the three New York ports on Long Island Sound; (2) whether plaintiffs are entitled to a new trial on their procedural due process claim; and (3) whether plaintiffs' substantive due process claim was properly dismissed as a matter of the law.

## DISCUSSION

### I. Federal Boundary Waters Act

■ This case raises for the first time the application of the Federal Boundary Waters Act, 46 U.S.C. § 8501(b), to Long Island Sound. We affirm the district court's declaration that:

> pursuant to 46 U.S.C. § 8501(b), and New York Navigation Law § 89–b, Connecticut-licensed pilots may be employed by foreign-flag vessels and American vessels under register transiting New York waters of the Long Island Sound which form a boundary between New York and Connecticut, and may specifically enter and leave ports located at Northville, Northport and Port Jefferson. Further, such persons may pilot those vessels to and from those New York ports without being required to first obtain a New York license.

774 F.Supp. at 742.

It is undisputed that a Connecticut pilot's license permits the pilot to navigate Long Island Sound to and from Connecticut ports, and a New York pilot's license permits the pilot to navigate Long Island Sound to and from New York ports. It is also undisputed that neither state purports to license its pilots to navigate to and from its sister state's

ports. Port Jefferson, Northville and Northport are New York ports on Long Island Sound. If Long Island Sound is a boundary waterway, it follows that, under 46 U.S.C. § 8501(b), the master of a vessel entering or leaving these New York ports "may employ a pilot licensed or authorized by the laws of either of the 2 States"—New York or Connecticut.

The Board attempts to counter the plain language of the federal boundary statute with two arguments. First, the Board argues that the quoted statutory language means that one state's license confers a right of pilotage to a port in another state only if the pilot has secured a special endorsement on his license for that port. In other words, the Board contends that the boundary statute gives a Connecticut pilot the right to navigate to the New York port of Northport, for example, only if the Connecticut license bears a special "Northport" endorsement. This interpretation of the statute engrafts on it a requirement, not imposed by Congress, that is not consonant either with state sovereignty or with concurrent jurisdiction over boundary waters. It would be anomalous for Connecticut to assert authority over New York ports, and Connecticut has not done so. Accordingly, a Connecticut pilot would have to look to New York to obtain the special endorsement that the Board claims is necessary. If a Connecticut pilot could not dock at a New York port on the Sound without New York's permission, then the boundary statute is essentially a nullity, imposing no meaningful limitation on the system of state control of pilotage. We see no reason to look beyond the wording of the statute, which requires nothing more than a license from one of the two states in order for a pilot to navigate either states' ports situated on boundary waters.

■ In the alternative, the Board argues that Long Island Sound is not "boundary waters." The Board's argument is as follows. The term "boundary waters" as used in the federal statute refers only to a body of water which serves as a "natural" boundary between two states in accordance with the hornbook principle that the dominion of each state "extends to the middle of the stream."

When neighboring states express a contrary intention as to their respective dominions, by drawing an "actual" boundary line through a body of water, the whole body of water no longer serves as a boundary. When an actual boundary line exists, as measured in metes and bounds, that line "controls" the respective rights of neighboring states. New York and Connecticut have agreed upon an actual boundary line which divides Long Island Sound. Thus, according to the Board's argument, the only "boundary waters" in Long Island Sound are the molecules comprising the metaphysical plane of the actual boundary line—and therefore waters on the New York side of that line are New York waters to which the federal boundary statute does not apply.

This argument fails for at least two reasons. First, if a bilateral compact divides the waters in the way the Board contends, there would be no such thing as "boundary waters," because hornbook law draws a similar line at midpoint (in the absence of a compact), so that every drop of water theoretically can be determined to belong to one state or another. Second, the boundary statute makes no distinction between "natural" and "actual" boundary waters. If a body of water is "a boundary between 2 States," the statute applies, even if maps and state compacts draw a line through that body of water.

None of the few cases construing the federal boundary statute support the Board's strained reading. In *Leech v. Louisiana,* 214 U.S. 175, 29 S.Ct. 552, 53 L.Ed. 956 (1909), the Supreme Court upheld the conviction of a Mississippi-licensed pilot for piloting a foreign vessel up the Mississippi River to New Orleans through waters that lay entirely within Louisiana. The Court noted, however, that a Mississippi license might have been sufficient if the vessel's destination were a port situated further north, within the state of Mississippi, where the river forms a boundary between Louisiana and Mississippi. *Id.* at 178, 29 S.Ct. at 553. *See also Sweatt v. Florida Board of Pilot Commissioners,* 776 F.Supp. 1538 (M.D.Fla.1991) (boundary statute inapplicable to port located on a river wholly within Florida, even though access to port was by way of waters that form a

boundary between Florida and Georgia), *aff'd,* 985 F.2d 578 (11th Cir.1993); *The Glenearne,* 7 F. 604 (D.Or.1881) (ship could use either Oregon or Washington pilot while on the Columbia River, a waterway forming the boundary between the two states, but only an Oregon pilot could navigate while on the Wallamet River, which lies solely within Oregon).

Nor does *Warner v. Dunlap,* 532 F.2d 767 (1st Cir.1976), *cert. dismissed,* 470 U.S. 1024, 105 S.Ct. 1387, 84 L.Ed.2d 405 (1985), a decision of more recent vintage, support the Board's argument. In *Warner,* Connecticut-licensed pilots argued that Rhode Island lacked authority to regulate pilotage through its waters in Block Island Sound as to ships using Connecticut ports. The Connecticut pilots did not invoke the boundary statute, because Block Island Sound was admittedly not boundary water. However, they cited *Leech* for the proposition that a state's authority to regulate pilotage is limited to ships entering and departing its ports. The court rejected this argument, observing that "*Leech* dealt with pilotage in waters forming the boundaries between two states and with 46 U.S.C. § [8501(b)] which permits a vessel to use a pilot licensed in either state regardless of which state's port the vessel travels to.... Block Island Sound, however, does not serve as a boundary between states." 532 F.2d at 771 (footnote and citations omitted). *See also Reardon v. Arkell,* 59 F. 624, 625 (S.D.N.Y.1894) (boundary statute entitles New Jersey pilot to navigate a ship into and out of the Port of New York); *The Clymene,* 9 F. 164, 167–68 (E.D.Pa.1881), *aff'd,* 12 F. 346 (C.C.Pa.1882) (law requiring Pennsylvania license for pilotage to port of Philadelphia was "inoperative and void" under boundary statute because port is reached through boundary waters of Delaware Bay and River).

The Board's position that Long Island Sound is not "boundary waters" finds no support in either the opinion of the New York Attorney General, or the Navigation Law. In his 1986 formal interpretation of the boundary statute, the New York Attorney General opined that a Connecticut pilot may navigate a vessel through the New York

waters of Long Island Sound because "[t]here is no question that the Long Island Sound acts as the boundary between New York and Connecticut, and that pilots from either state may navigate those portions of the Sound which act[ ] as the boundary between the states." 1986 N.Y.Op. Att'y Gen. (86–F5) at 22. Similarly, New York Navigation Law § 89–b(1) implicitly assumes that Long Island Sound is a boundary between New York and Connecticut, given its provision that registered vessels "entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point" must take a New York-licensed pilot *or* a pilot licensed by *"any other state having concurrent jurisdiction over these waters."* (Emphasis added.) The emphasized language must mean Connecticut, the only state besides New York for which Long Island Sound is an interstate border, and can reasonably be read as an acknowledgement of the scope of the boundary statute.

In summary, because Long Island Sound is a boundary between New York and Connecticut, the federal boundary statute permits registered vessels entering or leaving the New York ports on the north shore of Long Island to employ a pilot licensed by either New York or Connecticut. Furthermore, nothing in the statute requires a Connecticut-licensed pilot to obtain any special endorsement with respect to those ports to perform pilotage services.

## II. Procedural Due Process Claim

■ Plaintiffs also brought a section 1983 claim that the Board, acting under color of state law, violated their procedural due process rights. Plaintiffs allege that (a) as holders of Connecticut pilot licenses, plaintiffs had a property right, established by the federal boundary statute, to pilot vessels to New York ports on Long Island Sound; (b) the Board's November 5, 1990 policy statement

deprived plaintiffs of that property right; and (c) the Board failed to provide notice and an opportunity to be heard prior to the deprivation. This claim was tried to a jury which rendered a verdict in favor of the Board.

On appeal, plaintiffs seek a new trial, contending that the district court improperly charged the jury that the necessary intent for establishing a procedural due process violation is specific intent to deprive plaintiffs of a property right, rather than the general intent to do that which was done. The Board concedes that it was error for the district court to give such an instruction. We need not reach that issue, however, because we agree with the Board that the procedural due process claim fails as a matter of law in any event, and should have been disposed of by directed verdict.

■ Plaintiffs' procedural due process claim should have been dismissed because the challenged official action—the Board's November 5 policy statement—was essentially legislative rather than adjudicative. Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause. *RR Village Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1204–05 (2d Cir.1987). These constitutional due process requirements apply only where the official action is "designed to adjudicate disputed facts in particular cases." *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). "When not bounded by statutory procedural requirements, the Supreme Court has consistently been willing to assume that due process does not require any hearing or participation in 'legislative' decisionmaking other than that afforded by judicial review after rule promulgation."[2] *Pickus v. U.S. Board of Parole*, 543 F.2d 240, 244 (D.C.Cir. 1976) (citing *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Bi–Metallic Investment Co. v. State Board of*

---

2. The Board was not "bounded by statutory procedural requirements" when it issued the November 5 policy statement. An "interpretive statement" or "statement of general policy" is exempt from the notice and hearing requirements of the New York State Administrative Procedure Act. *See* N.Y.A.P.A. § 102(2)(b)(iv), § 202

(McKinney's 1984 & Supp.1994). *See also White v. Shalala*, 7 F.3d 296, 303 (2d Cir.1993) (an agency rule is "interpretative" and exempt from statutory due process requirements if it is intended "to clarify an existing statute or regulation" rather than "to create new law, rights, or duties in what amounts to a legislative act").

*Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)).

*RR Village* supplies the test for determining whether official action is adjudicative or legislative. In that case, homeowners argued that they had a property right under New York law in promulgated sewage disposal rates and were denied due process when they were not afforded notice or a hearing as to retroactive increases. 826 F.2d at 1203–04. Town officials argued that the grant of a retroactive increase to one sewage disposal company should be considered legislative action, exempt from the constitutional requirements of procedural due process. This Court held in favor of the homeowners, stating:

> The test for determining whether official action is adjudicative or legislative focuses on the function performed by the decisionmaker, not on the method of selecting the decisionmaker, *cf. Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 284, 104 S.Ct. 1058, 1065–66, 79 L.Ed.2d 299 (1984) (policy decision by executive agency would be legislative action), or on the form in which the decision is announced, *see Philadelphia Co. v. SEC*, 175 F.2d 808, 812–13, 816–17 (D.C.Cir. 1948) (SEC's revocation of exemption to Rule was adjudicative action where the only intended and actual effect was to determine disputed issue in particular case), *vacated as moot*, 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715 (1949). Action is adjudicative when a decision is based on a determination of "facts about the parties and their activities, businesses, and properties." *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir.1971).... Proceedings that "adjudicate disputed facts in particular cases" are subject to the requirements of procedural due process. *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

826 F.2d at 1204–05 (quotation and citations omitted). Because the retroactive rate determination in *RR Village* was based solely on facts about one supplier, and not on "facts relating to the sewage disposal industry in general, much less of questions of social or economic policy or of broad economic factors," the homeowners were entitled to procedural due process. *Id.* at 1205.

Under this standard, the Board's issuance of the November 5 policy statement was legislative rather than adjudicative in character. The policy statement was a general explanation of the Board's authority, to be applied prospectively, and did not seek to impose any retroactive penalty. The Board did not attempt to adjudicate particular facts as to any one pilot or group of pilots. Indeed, the Board was *disavowing* any regulatory authority as to non-New York pilots. In arriving at its policy statement, the Board considered facts relating to pilotage in general, including environmental and safety concerns, economic factors, the legislative intent of the New York Navigation Law, the views of Connecticut authorities, and the lack of a dispositive interpretation of the boundary statute at the time.

Similarly, in *Air Line Pilots Association v. Quesada*, 276 F.2d 892 (2d Cir.1960), we held that the due process clause did not require the Federal Aviation Agency to provide a prior hearing to pilots affected by a regulation forbidding commercial air carriers from using pilots over age 60. *Id.* at 896. The Court determined that the FAA regulation was legislative rather than adjudicative because it had general application and looked to the future:

> The [FAA's] action does not lose the character of rule-making because it modifies the plaintiff pilots' claimed property rights in their licenses and their contractual rights under collective bargaining agreements to pilot planes beyond age sixty. Nor does the regulation violate due process because it modifies pilots' rights without affording each certificate holder a hearing. Administrative regulations often limit in the public interest the use that persons may make of their property without affording each one affected an opportunity to present evidence upon the fairness of the regulation.

*Id.*

Plaintiffs argue that the November 5 policy statement cannot be deemed a general, explanatory rulemaking because it affected

only a small number of persons—the Connecticut pilots who were attempting to compete for pilotage business to New York ports on Long Island Sound. It may be that, "when a rule adopted for general application applies only to a small number of persons, its characterization as legislation becomes suspect." *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir.1991). That concern cannot predominate, however, where the agency rule under attack announces the scope of what it considers to be its jurisdiction. That the Board's position turned out to be wrong, and had a predictable impact on identifiable individuals, did not convert its legislative action into an adjudication. *See Pickus v. U.S. Board of Parole*, 543 F.2d at 245 ("policy rules often have the effect of making individual outcomes more predictable"); *cf. United States v. Florida East Coast Ry. Co.*, 410 U.S. at 246, 93 S.Ct. at 821 (that an official action "may in its effects have been thought more disadvantageous by some railroads than by others does not change its generalized nature"); *AT & T v. FCC*, 572 F.2d 17, 22–23 (2d Cir.) (agency action intended to increase competition in telecommunications industry was legislative and not adjudicative, although adversely affecting AT & T), *cert. denied*, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

## III. Substantive Due Process Claim

▮ Plaintiffs also allege that the Board violated their substantive due process rights by taking actions under color of state law that were designed to and did injure their business and their use of Connecticut pilot licenses. Essentially, plaintiffs contend that the Board committed an intentional tort which rises to the level of a constitutional violation because the Board is a state actor and because the conduct allegedly was motivated by a desire to harm plaintiffs.

The district court directed a verdict in the Board's favor on this claim, holding that the evidence was insufficient because it did not "shock the conscience" or establish "systematic and intentional harassment." Plaintiffs concede that the Board's actions do not "shock the conscience," but argue that the Board's actions should have been weighed on the less stringent basis of whether the actions were "arbitrary and discriminatory." However the standard is articulated, plaintiffs' substantive due process claim fails.

▮ The due process clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986)). The clause has been held to have a substantive component that protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). The Supreme Court has warned, however, that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and openended." *Collins v. City of Harker Heights*, ⸺ U.S. ⸺, ⸺, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The due process clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976).

▮ A substantive due process claim based on allegedly tortious conduct by a state actor therefore ordinarily requires evidence of conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Collins*, ⸺ U.S. at ⸺, 112 S.Ct. at 1070; *see Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir.1989) (requiring evidence that official action was "arbitrary or irrational or motivated by bad faith"), *cert. denied*, 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990); *Chalfy v. Turoff*, 804 F.2d 20, 23 (2d Cir.1986) (per curiam) (requiring proof of "systematic and intentional harassment" to transform official action causing economic injury into a constitutional violation).

Application of this standard to the record in this case required the district court to dismiss the substantive due process claim, as was done. The Board's attempt to discour-

age use of the Montauk–Block Island Channel was supported by defensible safety and environmental concerns, and applied equally to all pilots. Similarly, the November 5, 1990 policy statement, though erroneous, was adopted with advice of counsel concerning an unsettled issue of law, and was not arbitrary or irrational. Overzealous or erroneous government action alone does not give rise to a constitutional violation. *See Rosa R. v. Connelly*, 889 F.2d at 439; *see also McClary v. O'Hare*, 786 F.2d 83, 89 (2d Cir.1986) (no substantive due process violation where "the only fact distinguishing this case from an ordinary tort action ... is the identity of the [tortfeasor]").

 To the extent the Board's actions were legislative and in the nature of rulemaking, plaintiffs' substantive due process claim is subject to a yet more stringent test: legislative acts are presumed valid and must be upheld if rationally related to a legitimate governmental objective. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974). Under this test, the Board's actions are not constitutionally infirm if the Board can articulate a rational basis for them. Because the Board's notices and policy statement served the concerns of New York's pilotage regulatory scheme, including safety, environmental protection and state prerogative, its actions survive substantive due process challenge. *See Kaufman v. City of New York*, 717 F.Supp. 84, 88 (S.D.N.Y.) (no substantive due process violation in requiring building owners to pay for asbestos removal even though municipality had approved asbestos installation in the first instance), *aff'd on opinion below*, 891 F.2d 446, 447 (2d Cir.1989) (per curiam), *cert. denied*, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.