McCORMACK SAND COMPANY, McC Sand Company, McCormack Sand Company, Inc., and Cow Bay Sand Company, Plaintiffs,

v.

TOWN OF NORTH HEMPSTEAD SOLID WASTE MANAGEMENT AUTHORITY, Benjamin Zwirn, Gerard W. Cunningham, Paul F. Ponessa, Donald Higgins, Jr., Rand A. Burgner, Town Board of the Town of North Hempstead and Alfredo Lamanna Trucking, Inc., Defendants.

No. 91 CV 3358 (JG).

United States District Court, E.D. New York.

March 27, 1997.

William D. Wall, Kenneth Auerbach, Sanford Strenger, Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P.C., Uniondale, NY, for Plaintiffs.

Ivan Kline, Town Attorney and Counsel to the Town of North Hempstead Solid Waste Management Authority, Manhasset, NY, Joseph Dibenedetto, Thomas J. Quigley, Elyse Pepper, Winston & Strawn, New York, NY, for North Hempstead Defendants.

Eugene P. Cimini, Jr., Jaspan, Ginsberg, Schlesinger, Silverman & Hoffman, Garden City, NY, for Defendant Alfredo Lamanna Trucking, Inc.

### MEMORANDUM AND ORDER

GLEESON, District Judge:

This case is about stockpiles of sand and other material left at a mining site. The material was stockpiled and left by plaintiff McCormack Sand Co., McC Sand Co., McCormack Sand Company Inc. and Cow Bay Sand Co. (collectively "McCormack Sand") when they vacated the site.[1] Two years later, the Town of North Hempstead

---

1. All of the plaintiffs are affiliated and, so far as pertinent to this case, appear to function as one entity.

Solid Waste Management Authority ("the Authority"), which owned the site, sold the stockpiled material. Plaintiffs claim that the material rightfully belonged to them, and that the Authority's sale of the sand violated their rights under the United States Constitution.

The North Hempstead Defendants—the Authority, the Town of North Hempstead ("the Town"), the Town Board of North Hempstead ("the Board"), and the individual members of the Board and the Authority—have moved for summary judgment on the federal claims. For the reasons set forth below, the motion is granted. Because I decline to exercise supplemental jurisdiction over the state law claims, they are dismissed.

## BACKGROUND

In July of 1956, Morewood Realty Corporation ("Morewood"), the owner of a 460–acre tract of land in Port Washington, New York ("the property"), entered into a thirty-year License Agreement with Colonial Sand & Stone, Inc. ("Colonial"). In exchange for the payment of rents and royalties, Morewood granted Colonial an exclusive license to mine, process and transport sand, gravel and related products on the property. Through a series of transfers, Colonial assigned its rights under the License Agreement to the plaintiffs.

From the time of these transfers until September 1989, plaintiffs operated a sand and gravel mine on the property. They mined and processed the sand and gravel on-site, then stockpiled the finished product until it could be sold and transported off the property. Plaintiffs also trucked in material to be mixed with the mined material when processing it for sale.

In 1988, the Authority purchased the property from Morewood for $33 million. The Authority was planning to construct a solid waste disposal facility at the site. Before transferring title to the Authority, Morewood

served notice on the plaintiffs that it was terminating the License Agreement. Plaintiffs sought and received a thirty-day extension, which permitted them to stay on the property until May 14, 1988.

However, plaintiffs remained on the property for a considerably longer period of time. They claim that they were led to believe that they could do so in order to sell the remaining stockpiles of sand and other products. Defendants claim that the only reason plaintiffs were allowed to remain on the property was to permit them to comply with their remediation obligations under the License Agreement. On April 20, 1989, the Authority ordered plaintiffs to cease all activities on the property. In August 1989, the Authority directed plaintiffs to vacate the property. Plaintiffs left the property on September 8, 1989, leaving behind 26 stockpiles of sand and other material, as well as certain material left in a settling basin. For simplification, I will refer to all of the material at issue as "the stockpiled material" or "the sand".

For most of the next two years, plaintiffs and defendants continued discussing plaintiffs' claims to the stockpiled material. Over plaintiffs' objection, on June 4, 1991, the Authority sold the stockpiled material to defendant Alfredo Lamanna Trucking, Inc. Shortly after the sale, plaintiffs commenced this action.[2]

Plaintiffs allege violations of 42 U.S.C. § 1983 as well as various torts under state law. Specifically, plaintiffs allege that defendants' sale of the stockpiled material violated their rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs also allege that the Authority, the Town and the individual defendants entered into a conspiracy to "commit constitutional tort" against the plaintiffs. They seek declaratory relief, damages for the alleged violations of § 1983, attorneys fees, and several million dollars in damages on their state law claims.

**2.** The plaintiffs have alleged that a series of political maneuvers within the Town put pressure on the Board and the Authority to raise money by selling the stockpiles. (The members of the Town Board serve *ex officio* as the Board of the Authority.) Apparently, as the result of elections,

the composition of the Board changed, and new Town Board members were elected who opposed construction of the solid waste treatment facility. The plans for the facility were scrapped, and the Town was allegedly left with $47 million of debt.

## DISCUSSION

■ Section 1983 provides a cause of action for damages to persons who are deprived of a constitutional right by the conduct of an official acting "under color of" state law. However, not all injuries resulting from official misconduct give rise to a constitutional violation. Ordinary breach of contract by state officers, for example, does not necessarily establish a constitutional violation. *Reich v. Beharry*, 883 F.2d 239, 242 (3d Cir.1989). This limitation reflects the bedrock principle that the United States Constitution is not a mere "font of tort law." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). The "constitutional shoals" confronting any effort to treat § 1983 as a general federal tort law have been repeatedly noted by the Supreme Court. *Id.* (citing *Griffin v. Breckenridge*, 403 U.S. 88, 101–02, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971)).

To begin with, federalizing tort law would constitute a substantial encroachment on state lawmaking authority. *See Paul v. Davis*, 424 U.S. at 698, 96 S.Ct. at 1159 (discussing the effect on the "relationship between the National and State Governments" if every legally cognizable injury committed by a state official established a constitutional violation). In addition, treating the Constitution and § 1983 as a general federal tort law could undermine the "great purposes" of the Due Process Clause. *Reich v. Beharry*, 883 F.2d at 242. The Constitution is not a grand compensation scheme; rather, it embodies our nation's most fundamental expression of the boundaries and scope of government power. These limitations are vital to the protection of ordered liberty. *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Section 1983 is an essential tool for enforcing these limitations. However, by substantially increasing the caseload of federal courts, over-

emphasis on compensation can "dilut[e] the ability of federal courts to defend our most significant rights." Christina Whitman, *Constitutional Torts*, 79 Michigan Law Review 5, 25 (1980). Indeed, some commentators have argued that the compensation-driven explosion of § 1983 actions has in fact led to a narrowing of underlying constitutional rights.[3]

It is thus imperative that courts maintain a balance between the importance of compensation as a tool for enforcing constitutional rights and the problems inherent in transforming the Constitution into a general federal tort law. With this principle in mind, I turn to plaintiffs' claims.

### A. The Summary Judgment Standard

In order for the defendants to prevail on their motion for summary judgment, there must be no genuine issue of material fact and the undisputed facts must entitle them to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must consider pleadings, interrogatories, depositions, admissions, and affidavits. All ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. When no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is appropriate. *Id.*

### B. The Ownership of the Stockpiled Sand and Gravel

Defendants argue first that plaintiffs had no ownership interest in the stockpiled mate-

---

3. Professor Henry Paul Monaghan, for example, describes *Paul v. Davis*, which found no constitutionally protected liberty interest in one's reputation, as a narrowing of due process rights resulting in part from the "staggering range of complaints" brought under § 1983 by "aggressive and inventive lawyers." Henry Paul Monaghan, *Of "Liberty" and "Property"*, 62 Cornell L.Rev. 405, 408 (1977). Gerald Gunther similar-

ly points out that the Court would not have been required to address the constitutional issue in *Paul* if § 1983 had not been read so broadly. Gerald Gunther, *Constitutional Law* 597 (12th Ed.1991). *See also Whitman, supra*, at 6–7 (concluding that the Court has engaged in a "close construction" of constitutional rights in order to discourage § 1983 litigants).

rial, and thus have no claim against the Authority for selling it. Plaintiffs agree that their claim of ownership to the sand is central to their allegations, but argue that the sand did in fact belong to them.

■ Who owned the sand turns on disputed facts. Defendants contend that plaintiffs' rights are governed exclusively by the Licensing Agreement. They argue that the meaning of the License Agreement is clear and unambiguous: the plaintiffs had no ownership interest in stockpiled materials until those materials were sold and transported from the property.

Defendants have not always maintained this position, however. According to an affidavit by John Kiernan, who was Town Supervisor and a member of the Authority at the time it bought the property, "[i]t was understood and agreed by all in the Authority and the Town that the product stockpiles were the exclusive property of plaintiffs." Kiernan Aff. (Aug. 4, 1994) ¶ 8. Defendants at one time claimed that "the stockpiled material was and is the property of the sand mining company."[4] Plaintiffs' Ex. 18 (an advertisement published by the Authority).

Moreover, plaintiffs claim that the stockpiles include material they trucked in to the site to supplement the sand and gravel mined from the property. This material, plaintiffs claim, was owned exclusively by them, and they did not lose title to it merely by adding it to materials of more questionable ownership.

Plaintiffs also claim ownership to material left in a settling basin. The Licensing Agreement appears to exempt this material from royalty requirements and indicates that plaintiffs were free to sell the material at will. Plaintiffs' Ex. 3, ¶ 3. Defendants argue that the License Agreement gives plaintiffs

no rights to the material in the settling basin, and that this material is waste product. The parties appear to agree that if it is waste, it belongs to the owner of the real property upon which it is located, *see Mathews Slate Co. v. Advance Indus. Supply Co.*, 185 A.D. 74, 172 N.Y.S. 830, 832 (3d Dep't 1918), but dispute the question whether the material is waste. Defendants cite an affidavit of plaintiffs' accountant stating that it was treated as waste; plaintiffs cite an expert report that defendants have removed, presumably for sale, thousands of cubic feet of the material.

There is a genuine issue of material fact as to who owned the stockpiled material. If plaintiffs trucked in material and added it to the stockpiles, the ownership of the stockpiles may turn on facts such as how much material was trucked in and to what extent it was mixed with other material. The question whether the settling basin material was waste depends on facts such as whether it has commercial value, and whether it was ever sold by defendants.

■ In addition, the parties' post-termination conduct raises a genuine issue of fact. As noted above, there is considerable disagreement as to the reason plaintiffs were allowed to remain on the property; defendants claim it was only to facilitate remediation of the site, but plaintiffs contend that they were also permitted to sell their remaining stockpiles. Each side has produced correspondence and has introduced affidavits supporting its claims. Thus, whether the parties' post-termination conduct created an ownership interest on the part of the plaintiffs is also a genuine issue of material fact.[5]

### C. *The Fourth Amendment Claim*

■ Plaintiffs claim that the Authority's sale of the stockpiled materials constituted

---

**4.** Plaintiffs claim that the defendants' change in perspective results in part from a change in membership of the Authority and Town Board.

**5.** Although the License Agreement purports to "contain all agreements and conditions made between the parties" and states that it can only be modified in writing (License Agreement ¶ 25), New York courts have recognized that oral modifications to a contract may be enforced either when there has been "partial performance of the

agreement to modify" or when "one party has induced the other party to rely on an oral modification." *Towers Charter & Marine v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir.1990). The plaintiffs have presented evidence that they relied on the defendants' treatment of the stockpiles as plaintiffs' property, and that plaintiffs were led to believe that they would be allowed to remain on the property in order to sell the stockpiles.

an impermissible seizure under the Fourth Amendment, as applied to the states by the Fourteenth Amendment. In *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court revived a traditional exception to the Fourth Amendment's prohibition of warrantless searches and seizures. The rule in *Oliver* allows state agents to search for and seize evidence located in "open fields." The principal rationale underlying the "open fields doctrine" is that people do not have an objectively reasonable expectation of privacy when they leave their possessions in the open. *Schneider v. County of San Diego,* 28 F.3d 89, 91 (9th Cir.1994) (noting that the open fields exception is closely linked with modern expectations of privacy), *cert. denied,* 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1077 (1995). Thus, the application of the open fields doctrine is generally limited to those areas in which agents of the state or the general public are lawfully permitted. *Wilson v. Health and Hospital Corp. of Marion County,* 620 F.2d 1201, 1209 (7th Cir.1980).

■ The open fields doctrine is clearly applicable in this case. First, the state agency that seized the plaintiffs' alleged property—the Authority—owned the land on which the property was located. Second, the stockpiles were in the open and visible to anyone walking through the property. I reject plaintiffs' claim that they had a reasonable privacy interest in several tons of sand and gravel that was stockpiled on publicly-owned land. Accordingly, defendants' motion for summary judgment as to plaintiffs' Fourth Amendment claim is granted.

D. *The Fifth Amendment Claim*

■ Plaintiffs allege that the Authority's sale of their sand was a taking without just compensation, prohibited by the Fifth Amendment of the United States Constitution (as applied to the states by the Fourteenth Amendment). The Fifth Amendment does not bar takings altogether; rather, it bars takings without just compensation. *Miller v. Campbell County,* 945 F.2d 348, 352 (10th Cir.1991), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992). In order to be ripe for review, a regulatory

takings claim must satisfy a two-pronged inquiry. *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). First, the government entity charged with enforcing the regulations at issue must have rendered a "final decision." *Id.* at 186, 105 S.Ct. at 3116. Second, the plaintiff must have sought compensation in state proceedings if the state provides "reasonable, certain and adequate provision for obtaining compensation." *Id.* at 194, 105 S.Ct. at 3120 (citation omitted). "The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Id.* at 195 n. 13, 105 S.Ct. at 3121 n. 13.

■ Defendants argue that the plaintiffs' Fifth Amendment claim does not satisfy the second *Williamson* prong because plaintiffs have not pursued their state remedy. New York law provides procedures for obtaining compensation for the alleged taking, including a cause of action for inverse condemnation under Article I, Section 7 of the New York Constitution. In the Second Circuit, a § 1983 claim is not ripe for review if the state offers a cause of action such as inverse condemnation and the claimant has not pursued such action. *See Southview Assoc. Ltd. v. Bongartz,* 980 F.2d 84, 99–100 (2d Cir.1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). Since plaintiffs have not pursued inverse condemnation or any other state remedy for compensation, their Fifth Amendment claim is not ripe for review and is accordingly dismissed.

E. *The Substantive Due Process Claim*

■ Plaintiffs claim that the sale of the stockpiles violated their substantive rights under the Due Process Clause of Fourteenth Amendment. In order for a plaintiff to maintain a substantive due process claim against a municipality, the plaintiff must demonstrate that the municipality's actions were willful, arbitrary, conscience-shocking or oppressive in a constitutional sense. *Collins v. City of Harker Heights,* 503 U.S. 115, 126–28, 112 S.Ct. 1061, 1069–70, 117 L.Ed.2d 261 (1992). Substantive due

process does not provide protection against state actions which are merely "incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994).

Most claims sounding in tort cannot be brought as violative of substantive due process. For example, negligent actions on the part of the municipality cannot support a substantive due process claim. *Collins*, 503 U.S. at 126–27 n. 10, 112 S.Ct. at 1069 n. 10. In the Second Circuit, intentional torts by government actors are not actionable as substantive due process violations unless they are arbitrary or conscience-shocking. *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir.1994); *accord Ayeni v. Mottola*, 35 F.3d 680 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995).

Plaintiffs allege that the Authority intentionally sold their property, knowing that it belonged to plaintiffs. Their argument that the sale was arbitrary or conscience-shocking, however, is unsupportable as a matter of law. At bottom, the alleged deprivation arises from a commercial dispute. Although possibly erroneous, the Authority's conclusion that it could legally sell the stockpiles is not without support in the License Agreement. Moreover, the Authority involved the town attorney in the sale from the time it was first proposed.

Given the ambiguity of the ownership of the sand, the sale of the stockpiles is simply not the type of oppression which gives rise to a substantive due process claim. *Compare Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (conduct of officers, who forcibly had suspect's stomach pumped, shocked the conscience) *and Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (forced administration of psychotropic drugs violated substantive due process) *with Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133 (agency's attempt to regulate harbor pilots, although erroneous, was not arbitrary or irrational). As the Second Circuit has explained in evaluating a malicious prosecution claim, "[w]here a 'plaintiff has not been physically abused, detained, prosecuted due to racial or political

motivation or otherwise deprived of equal protection of the law, courts are reluctant to find 'conscience-shocking' conduct that would implicate a constitutional violation.'" *Easton v. Sundram*, 947 F.2d 1011, 1018 (2d Cir. 1991) (quoting *Torres v. Superintendent of Police of Puerto Rico*, 893 F.2d 404, 410 (1st Cir.1990)), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

It would greatly expand the scope of substantive due process to allow every tort arising from a commercial conflict between a state agency and a licensee to be transformed into a constitutional issue. This is precisely the result that the court-crafted restrictions on substantive due process are designed to avoid. *See Collins*, 503 U.S. at 128, 112 S.Ct. at 1070. Defendants' motion for summary judgment on plaintiffs' substantive due process claim is therefore granted.

### F. The Procedural Due Process Claim

Plaintiffs also claim that the defendants violated their rights to procedural due process by not providing them with a pre-deprivation hearing. "In order to sustain an action for deprivation of property without due process of law, a plaintiff must 'first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process.'" *Local 342, Long Island Public Service Employees v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir.1994) (quoting *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir.1990) (per curiam)). The Supreme Court has held that the Constitution normally requires some sort of hearing *before* a state may deprive a person of liberty or property, *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990), and the adequacy of the procedure is measured by reference to the factors set forth in *Mathews v. Eldridge* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

In some cases, however, the appropriate test is set forth in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Hudson v. Palmer*,

468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). *"Parratt* and *Hudson* represent a special class of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the state could be expected to provide." *Zinermon,* 494 U.S. at 128, 110 S.Ct. at 985.

In *Parratt,* a prison employee accidentally lost a hobby kit that belonged to a prisoner. The prisoner claimed that his right to due process of law had been violated because the state failed to conduct a hearing before its employee accidentally lost the hobby kit. *Parratt,* 451 U.S. at 530, 101 S.Ct. at 1910. Noting that the prisoner could pursue postdeprivation remedies, the Supreme Court found no constitutional violation where a deprivation results from "unauthorized" acts which are contrary to "established state procedure." *Id.* at 543, 101 S.Ct. at 1916–17. As the Court explained in *Hudson,* "The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson,* 468 U.S. at 533, 104 S.Ct. at 3203.

In *Hudson,* a prison guard allegedly destroyed an inmate's pillow case intentionally. Reasoning that intentional deprivations that are "random and unauthorized" are also unpredictable by the state, the Court extended *Parratt* to intentional deprivations of property in certain circumstances when postdeprivation remedies are available. *Id. accord Hellenic American Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 881 (2d Cir.1996) (no violation when deprivation caused by "random, arbitrary act by a state employee," and a postdeprivation remedy is available). The *Parratt/Hudson* doctrine thus dictates that there is no constitutional violation by a state when (1) the act of deprivation is "random and unauthorized;" and (2) the state provides adequate postdeprivation remedies.

Defendants argue that because the Authority's enabling legislation did not empower it to engage in takings, its action—if it was a taking—was "random and unauthorized."

The deliberateness with which the Authority sold the sand, however, demonstrates that the sale was careful, considered, meticulous state action—far removed from the "random and unauthorized" conduct which is the subject of *Parratt* and *Hudson.*

■ The Authority apparently began considering the sale of the sand no later than December 27, 1990, when Rand Burgner, the Executive Director of the Authority, raised the issue in a letter to the Authority's Chairman, Ben Zwirn. Burgner asked Zwirn for guidance on the "policy issue" of whether the Authority was interested in selling the stockpiles. Burgner himself ultimately recommended that the Authority solicit bids for purchase of the material. On February 19, 1991, the Town Attorney wrote to Zwirn (who was also Town Supervisor) to ask the Town Board's position on selling the sand. Zwirn responded on February 25, 1991, that in his opinion, the sand should be sold.

At an April 1991 meeting of the Authority, member Gerard Cunningham offered a resolution authorizing Burgner to advertise for bids for purchase of the sand. The resolution was approved without dissent. When the Authority subsequently advertised for bids, plaintiffs wrote a letter objecting to the proposed sale, noting their claim that they owned the material. The Town Attorney responded with a three-page letter, which in part cautioned plaintiffs "not to interfere with any effort by the Authority to dispose of any material on the Morewood property."

On May 21, 1991, after receiving bids, the Authority met again to consider the sale of the sand. Zwirn, in his capacity as Chairman of the Board of the Authority, recommended that the sand be sold to defendant Alfredo Lamanna Trucking, Inc. The Board approved a resolution authorizing the sale. As in the earlier vote, the resolution was approved unanimously. On June 4, 1991, the Authority executed the contract for sale of the sand. Four people signed on behalf of the Authority—Chairman Benjamin Zwirn, the Executive Director, the Town Attorney, and the Authority's Assistant Treasurer.

In short, defendants engaged in a six-month process of considering whether to sell

the sand. The Town Attorney was fully engaged in the issue from near the beginning of the process through placing her signature on the final contract. The Board of the Authority twice deliberated and twice unanimously passed resolutions regarding the sale of the sand—the second resolution expressly authorizing the sale.

These facts do not present even the faintest echo of *Parratt* and *Hudson*. This case is not about a prison mailman losing an inmate's package, or a prison guard, on a private vendetta, ripping up an inmate's pillowcase. Nor is the conduct alleged here analogous to a mayor's "random and arbitrary" decision to bar an organization from competing for city contracts. *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d at 881. Defendants' careful, considered, six-month decision is precisely the kind of deliberate conduct which is subject to the general requirements of procedural due process, as set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). If a six-month process that involved careful deliberation and two votes of a policy-making government body constitutes "random and unauthorized" conduct, then the *Parratt* doctrine must apply to virtually all government action. Were this the law, the *Parratt* analysis would collapse to a one-part test: is there an adequate post-deprivation remedy. But this is not the law; *Parratt* and *Hudson* represent a "special case" of due process analysis where the nature of the conduct at issue is such that a predeprivation hearing would be impracticable. While a predeprivation hearing may not have been required in this case, see below, it is impossible to conclude that the conduct at issue here was so "random and unauthorized" as to render such a hearing impracticable. Accordingly, I reject defendants' argument that the *Parratt/Hudson* doctrine governs this case. Plaintiffs' procedural due process claims are properly reviewed under the *Mathews v. Eldridge* analysis.

■ Applying *Mathews v. Eldridge*, defendants' motion for summary judgment with respect to plaintiffs' due process claim must be granted. *Mathews* requires the Court to balance several factors to determine if the

process at issue was adequate: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903.

The interest that plaintiffs assert here is monetary: they claim the loss of a fungible good which they intended to sell. Hence, any damages to plaintiffs are fully compensable through postdeprivation proceedings, such as a tort action in state court. Moreover, it is doubtful that the existence of a predeprivation hearing would reduce the risk of erroneous contract interpretations by the Authority resulting in the sort of deprivations alleged here. As the facts alleged by plaintiffs highlight, the Authority did in fact engage in a very careful and deliberate process—and yet this deliberateness still did not prevent an allegedly erroneous deprivation. Finally, a substantial burden would be imposed upon state agencies if they were forced to provide predeprivation hearings every time the interpretation of a contract involved ambiguity as to ownership of certain property.

The *Mathews* factors plainly require the conclusion that a predeprivation hearing was not required in this case. Accordingly, defendants' motion for summary judgment with respect to plaintiffs' procedural due process claim is granted.

### G. Conspiracy Claim

Since all of the plaintiffs' § 1983 claims have been rejected, the plaintiffs have no basis for their "constitutional conspiracy" claim; this claim is accordingly dismissed.

### H. State Claims

■ Plaintiffs' federal claims have all been rejected. Accordingly, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims. *See* 28 U.S.C.

1367(c)(3); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment on the federal claims is granted, and plaintiffs' state law claims are dismissed.[6]

So Ordered.

---

6. To the extent claims remain against Alfredo Lamanna Trucking, Inc., they are state law claims over which I decline to exercise supplemental jurisdiction, and they are accordingly dismissed. *See* 28 U.S.C. 1367(c)(3); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).